[Crim. No. 20359. Feb. 22, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
JOSEPH GLENN POPE, Defendant and Appellant.

## COUNSEL

Paul N. Halvonik, State Public Defender, Clifton R. Jeffers, Chief Assistant State Public Defender, and Ezra Hendon, Deputy State Public Defender, for Defendant and Appellant.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Edward P. O'Brien, Assistant Attorney General, W. Eric Collins and Nathan D. Mihara, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BIRD, C. J.**—Appellant, Joseph Glenn Pope, appeals from his conviction for second degree robbery. His sole contention is that he was denied his constitutional right to the effective assistance of counsel at trial.

I

Late in the evening of February 24, 1976, Herman E. Brower was robbed in a parking lot outside a bar in Cotati. Brower had just left the Trade Winds bar where he had been drinking. Brower testified that he had paid for a drink with a $20 bill and that a black man, with whom Brower had been chatting, had picked up the change and put it in his pocket. This man suggested that they go out for dinner and started to leave. Brower followed.

Once outside the bar, Brower heard footsteps behind him. The black man said to Brower, "He's coming with us." The next thing Brower remembered was being shoved to the ground by the black man, who then held Brower's legs for a white man, who removed Brower's wallet. Although intoxicated at the time of the robbery, Brower later identified appellant from a photographic lineup as his black assailant. Brower could not identify appellant at trial.

The day after the robbery, Cotati police arrested appellant and seized a wallet which contained $56.[1] At the stationhouse, appellant was advised of his *Miranda* rights, with an additional admonition by the police: "Further, you have the right to make any statement you wish which might clarify or explain your position in this matter." Appellant stated that he understood his rights and signed a waiver form.

After initially denying that he had even spoken to Brower at the Trade Winds bar, appellant changed his story several times, each time admitting a greater degree of involvement as the police confronted him with additional pieces of information. Ultimately, after trying to "make a deal," appellant told police he had witnessed the robbery which he said was committed by two white men and a black. Although the two white men, Harbin and Stoker, became police suspects in the robbery, it appears that only appellant was charged with the crime.

Two and one-half months before trial, the Sonoma County Public Defender was appointed to represent appellant. However, it was not until four working days before trial that the office assigned a deputy public defender to try the case.[2]

Before trial, the court appointed a psychiatrist to assist in appellant's defense. Although the augmented record on appeal does not include the psychiatrist's report, the record does contain two previous psychological evaluations which showed that appellant's mental capabilities were limited. These reports, written in 1973 and 1975, placed appellant's intelligence in the "borderline defective" category of retardation.[3] The

[1]The police later showed the wallet to Brower who could not identify it. The prosecution introduced the wallet and its contents into evidence at trial without objection.

[2]Trial counsel was at least the fourth attorney from the office to represent appellant in proceedings related to the case. At trial she was assisted by the head of the office.

[3]These evaluations were read and considered by the trial judge after trial and before he ordered appellant committed for diagnosis pursuant to Penal Code section 1203.03. The diagnostic report and the report of another psychiatrist who examined appellant before sentencing were consistent with the conclusions of the 1973 and 1975 evaluations.

The record does not show whether trial counsel obtained copies of the 1973 and 1975

doctors who examined appellant stated that he "function[ed] intellectually like a child"; that he could not make change or drive a car; that he was gullible and suggestible; that instructions to him must be couched in "simple, concrete terms"; and that he had a "poor tolerance for ambiguity."[4]

No evidence as to appellant's limited intelligence was introduced at trial or used before trial to challenge the admissibility of appellant's out-of-court statements to police. The sole defense presented by appellant's counsel was that the robbery was committed by the two other suspects, Harbin and Stoker. There was testimony that the two men were troublemakers and that they had followed appellant and the victim out of the bar on the night of the robbery. Appellant's counsel did not seek to subpoena Harbin and Stoker before trial.

In cross-examining a police officer, appellant's counsel sought to elicit extrajudicial statements made by one suspect to the other. The officer had overheard Harbin tell Stoker that "we were seen leaving the Trade Winds [but the police] haven't got any evidence and we don't have anything to worry about." The prosecutor objected on the grounds that such hearsay could not be admitted unless counsel made a showing that the declarant was unavailable.[5] Trial was adjourned to give defense counsel an opportunity to subpoena Harbin and Stoker.

On the following day, the deputy public defender produced Harbin and called him as a witness. On advice of a newly appointed private counsel, Harbin invoked his Fifth Amendment privilege.[6] Stoker, on the other hand, was not located and the prosecution questioned whether the public defender's office had exercised "reasonable diligence" in seeking

evaluations before trial, or whether she knew of their existence at that time. However, counsel was aware of appellant's mental limitations, as indicated by her opening statement in which she asserted that "Mr. Pope has a borderline intelligence."

[4]The record does not establish that appellant suffered from any emotional illness or that he could not tell right from wrong. Before sentencing, the trial judge characterized appellant as a man "who appears to be responsible for his actions in a purely legal sense, but that's about all."

[5]Evidence Code section 1230 provides in pertinent part: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

[6]Exercise of this privilege rendered Harbin "unavailable as a witness" within the meaning of Evidence Code section 240, which provides in part: "(a) Except as otherwise provided in subdivision (b), 'unavailable as a witness' means that the declarant is: (1) [e]xempted or precluded on the ground of privilege from testifying concerning the matter to which his statement is relevant . . . ."

to procure Stoker's attendance.[7] Defense counsel acknowledged that the only efforts to obtain Stoker's presence at trial had been made by telephone. When the court asked if counsel had reached Stoker, counsel responded: "No, your Honor, we were unable to. We did attempt to contact him last week. This case was actually assigned to an attorney on Tuesday. That particular attorney, being myself, was in hearing on Tuesday, Wednesday, Thursday and Friday, so the calls were made in the late afternoon, when he was apparently still at work, but those messages were not returned."[8]

Counsel also offered an explanation as to why the calls were not returned: "Unfortunately, you see, Harbin's a client of ours, and he knows we are representing Pope, and he is not answering the phone calls."

The court accepted the deputy public defender's explanation and held that there had been due diligence in seeking to secure Stoker's presence. Later, Harbin's extrajudicial statement to Stoker was admitted into evidence.

In closing argument, defense counsel argued that the only direct evidence of appellant's participation in the robbery was the identification by the victim, who had been drinking on the night of the incident. At one point, counsel sought to minimize the significance of appellant's inconsistent statements to the police, suggesting that the inconsistency resulted from appellant's limited mental capacity. However, the court ordered her to discontinue that line of argument since no evidence had been introduced on that issue.

The jury found appellant guilty of second degree robbery. Following a diagnostic study and recommendation by the Department of Corrections, appellant was sentenced to state prison.

---

[7] Evidence Code section 240, subdivision (a)(5) provides that a declarant is "unavailable as a witness" if he is "[a]bsent from the hearing and the proponent of his statement has exercised *reasonable diligence* but has been unable to procure his attendance by the court's process." (Italics added.) The issue of Stoker's unavailability arose because defense counsel indicated that hearsay statements made by Stoker might be introduced.

[8] The head of the public defender's office, who was also present at trial, added: "I might state the comment, if I may, by [the deputy public defender], although she was in hearings, I know from personal knowledge that she worked on the case mornings and evenings and then had the benefit of all the other lawyers that were involved in Mr. Pope's case, including myself and others, and we, hopefully, were completely prepared to proceed."

## II

This court must determine whether appellant's legal representation at trial was inadequate. Two basic grounds are advanced by appellant: (1) the failure by counsel to make use of the record of appellant's limited intelligence; and (2) her failure to interview or subpoena the two other suspects, Harbin and Stoker, before trial commenced. In order to assess the adequacy of the legal assistance appellant received, this court must determine the proper standard by which trial counsel's performance is to be measured.[9]

In *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487], this court articulated a strict standard to measure the constitutional right to " 'effective aid in the preparation and trial of the case.' (*Powell* v. *State of Alabama,* 287 U.S. 45, 71 [53 S.Ct. 55, 77 L.Ed. 157, 171-172, 84 A.L.R. 527, 541].)" In order to obtain relief on appeal, "[i]t must appear that counsel's lack of diligence or competence reduced the trial to a 'farce or a sham.' [Citations.]" (*People* v. *Ibarra, supra,* 60 Cal.2d at p. 464.)

In several cases, this court has moved away from the "farce or sham" standard. For example, some decisions of this court have held that a defendant is entitled to counsel " 'reasonably likely to render, *and rendering* reasonably effective assistance.' [Citations.]" (*In re Saunders* (1970) 2 Cal.3d 1033, 1041 [88 Cal.Rptr. 633, 472 P.2d 921], original italics; *In re Williams* (1969) 1 Cal.3d 168, 176 [81 Cal.Rptr. 784, 460 P.2d 984].) Other decisions employ the alternative test of whether counsel "effectively suppl[ied] to a defendant those skills and legal knowledge which we can reasonably expect from any member of the bar." (*People* v. *Cook* (1975) 13 Cal.3d 663, 672-673 [119 Cal.Rptr. 500, 532 P.2d 148]; *People* v. *Steger* (1976) 16 Cal.3d 539, 551 [128 Cal.Rptr. 161, 546 P.2d 665, 83 A.L.R.3d 1206]; *People* v. *Camden* (1976) 16 Cal.3d 808, 815 [129 Cal.Rptr. 438, 548 P.2d 1110].)[10]

Insofar as it survives, the "farce or sham" standard (or its alter ego, the "farce and mockery" standard) has been widely criticized by legal

[9] Appellant was indigent and represented by appointed counsel at trial. Thus, the present case does not involve the appropriate standard for adequate representation by a retained criminal attorney. This court need not decide whether that standard would differ from the one described herein.

[10] These decisions apply this test conjunctively with the "farce or sham" standard. Still other opinions of this court have applied the "farce or sham" standard exclusively. (E.g., *People* v. *Jenkins* (1975) 13 Cal.3d 749, 753 [119 Cal.Rptr. 705, 532 P.2d 857]; *People* v. *McDaniel* (1976) 16 Cal.3d 156, 179 [127 Cal.Rptr. 467, 545 P.2d 843].)

scholars. (See generally, e.g., Bazelon, *The Defective Assistance of Counsel* (1973) 42 U.Cin. L.Rev. 1, 28; Finer, *Ineffective Assistance of Counsel* (1973) 58 Cornell L.Rev. 1077, 1078-1081; Note, *Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review* (1977) 13 Colum. J. L. & Soc. Prob. 1, 32-37.) A growing number of other jurisdictions have repudiated it outright. (E.g., *Moore v. United States* (3d Cir. 1970) 432 F.2d 730, 737 (en banc); *United States ex rel. Williams* v. *Twomey* (7th Cir. 1975) 510 F.2d 634, 641; *State v. Harper* (1973) 57 Wis.2d 543, 552, 557 [205 N.W.2d 1, 6, 9]; *People v. Garcia* (1976) 398 Mich. 250, 266 [247 N.W.2d 547, 553].) Significant among these jurisdictions is the federal Court of Appeals for the District of Columbia, the very court which enunciated the "farce and mockery" rule in the first instance. (See *United States* v. *DeCoster* (D.C. Cir. 1973) 487 F.2d 1197, 1201-1202; *Beasley* v. *United States* (6th Cir. 1974) 491 F.2d 687, 693-694.)

The reasons set forth by these courts and commentators for replacing the "farce or sham" standard are compelling. The standard originated in decisions which held that the right to competent representation derived solely from the due process clause of the Constitution and not from the provision guaranteeing the right to the assistance of counsel. (*Diggs* v. *Welch* (D.C. Cir. 1945) 148 F.2d 667, 668-669; *Jones* v. *Huff* (D.C. Cir. 1945) 152 F.2d 14, 15.)[11] ▮ This view has been thoroughly discredited, for courts now recognize that the right to competent representation at trial is grounded in the constitutional right to the assistance of counsel. (See *McMann* v. *Richardson* (1970) 397 U.S. 759, 771, fn. 14 [25 L.Ed.2d 763, 773, 90 S.Ct. 1443].) Accordingly, constitutionally adequate assistance can no longer be measured by the due process standard of *Ibarra,* but instead must be determined by a standard bottomed on the Sixth Amendment of the United States Constitution and article I, section 15 of the California Constitution.[12] (See generally, Comment, *The Right to Competent Defense Counsel: Emergence of a Sixth Amendment Standard of Review on Appeal and the Persistence of the "Sham and Farce" Rule in California, supra,* 15 Santa Clara Law. 355.)

[11]The "farce or sham" rule announced in *Ibarra* may be traced back to *Diggs* v. *Welch, supra,* 148 F.2d 667. (See Comment, *The Right to Competent Defense Counsel: Emergence of a Sixth Amendment Standard of Review on Appeal and the Persistence of the "Sham and Farce" Rule in California* (1975) 15 Santa Clara Law. 355, 377.) Further, the due process roots of *Ibarra* are evident in that decision's explicit reliance on *Jones* v. *Huff, supra,* 152 F.2d 14. (See *People* v. *Ibarra, supra,* 60 Cal.2d at p. 465.)

[12]Both constitutional provisions accord defendants in criminal cases a right to the "assistance of counsel." The California Constitution's right to counsel provision "was adopted to secure to the accused person all the benefits which may flow from the employment of counsel to conduct his defense [citation] . . . ." (*People* v. *Avilez* (1948) 86 Cal.App.2d 289, 294 [194 P.2d 829], discussing former Cal. Const., art. I, § 13, now art. I, § 15.)

The constitutional right to the adequate assistance of counsel suggests a focus on the quality of the representation provided the accused, while due process concerns itself with the fairness of the trial as a whole. "One may receive ineffective assistance of counsel even though the proceedings have not been a farce or mockery. [Citation.]" (*Herring* v. *Estelle* (5th Cir. 1974) 491 F.2d 125, 128.) Indeed, a substantial portion of the obligation counsel owes is not directly connected with the trial but involves investigation and advice at pretrial and posttrial stages. (See generally, ABA Project on Standards for Crim. Justice, Stds. Relating to the Prosecution Function and the Defense Function (Approved Draft 1971) pp. 147-148, 225-228.) Thus, neither the Sixth Amendment nor article I, section 15 is satisfied by a standard which requires the trial to have been reduced to a farce or sham.

Further, the *Ibarra* standard is vague and subjective. As described by one federal court of appeals, "The phrase 'farce and mockery' has no obvious intrinsic meaning. What may appear a 'farce' to one court may seem a humdrum proceeding to another. The meaning of the Sixth Amendment does not, of course, vary with the sensibilities and subjective judgments of various courts. The law demands objective explanation, so as to ensure the even dispensation of justice." (*Beasley* v. *United States, supra,* 491 F.2d at p. 692.)[13]

■ In *McMann* v. *Richardson, supra,* 397 U.S. at page 771 [25 L.Ed.2d at p. 773], the United States Supreme Court set forth a more objective standard for testing the adequacy of counsel's representation. The court stated that defense counsel's pretrial advice must be "within the range of competence demanded of attorneys in criminal cases." (Accord, *Tollett* v. *Henderson* (1973) 411 U.S. 258, 264 [36 L.Ed.2d 235, 241-242, 93 S.Ct. 1602].) Following *McMann,* the Court of Appeals for the District of Columbia held that *"a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."* (*United States* v. *DeCoster, supra,* 487 F.2d at p. 1202, italics original.)

---

[13]Case-by-case analyses confirm the disparate and inequitable results which the "farce and mockery" standard generates among different courts. (See Comment, *The Right to Competent Defense Counsel: Emergence of a Sixth Amendment Standard of Review on Appeal and the Persistence of the "Sham and Farce" Rule in California, supra,* 15 Santa Clara Law. at p. 362.) The reason for such disparity is evident. "The use of a short negative statement mandating what a trial should not be offers no guidance to an appellate court trying to decide what constitutes effective representation." (Note, *Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review, supra,* 13 Colum. J. L. & Soc. Prob. 1, 37.)

The *DeCoster* rule expresses counsel's duty to act as "an active advocate in behalf of his client" (*Anders* v. *California* (1967) 386 U.S. 738, 744 [18 L.Ed.2d 493, 498, 87 S.Ct. 1396]), while testing counsel's actions by the familiar and objective standard of the ordinarily prudent lawyer. (Cf. *Smith* v. *Lewis* (1975) 13 Cal.3d 349, 358-359 [118 Cal.Rptr. 621, 530 P.2d 589, 78 A.L.R.3d 231] [attorney's civil liability for malpractice measured by standard of reasonableness].) The chief virtue of this standard lies in its ability to uphold the guarantees of the Sixth Amendment and article I, section 15. Since the state is constitutionally required to provide indigent defendants with counsel (*Gideon* v. *Wainwright* (1963) 372 U.S. 335 [9 L.Ed.2d 799, 83 S.Ct. 792, 93 A.L.R.2d 733]; see *Gordon* v. *Justice Court* (1974) 12 Cal.3d 323, 332 [115 Cal.Rptr. 632, 525 P.2d 72, 71 A.L.R.3d 551]), a conviction may not be upheld if the state has furnished an indigent with representation of lower quality than that of a reasonably competent attorney acting as a diligent, conscientious advocate.

In addition, the standard of reasonably competent representation affords a measurable guide for evaluating the quality of trial counsel's decisionmaking. ■ "Defense strategy and tactics which lawyers of ordinary training and skill in the criminal law would not consider competent deny a criminal defendant the effective assistance of counsel, if some other action would have better protected a defendant and was reasonably foreseeable as such before trial. [Citation.]" (*Beasley* v. *United States, supra,* 491 F.2d at p. 696.) Reviewing courts should avoid second-guessing counsel's informed choice among tactical alternatives, but a defense attorney's freedom to make such decisions is not without limits. Every person accused of a criminal offense is entitled to constitutionally adequate legal assistance. (E.g., *In re Saunders, supra,* 2 Cal.3d at p. 1041.) That right is denied if trial counsel makes a critical tactical decision which would not be made by diligent, ordinarily prudent lawyers in criminal cases. This is true even if the decision were not made from ignorance of the law or a fact.

■ To render reasonably competent assistance, an attorney in a criminal case must perform certain basic duties.[14] (See generally, ABA Project on Standards for Criminal Justice, Stds. Relating to the Prosecution Function and the Defense Function, *supra,* p. 141 et seq.) Generally, the Sixth Amendment and article I, section 15 require counsel's "diligence and active participation in the full and effective preparation of his client's

---

[14]The duties described herein are not meant as an exhaustive list of a lawyer's constitutional obligations in a criminal case.

case." (*People* v. *Vest* (1974) 43 Cal.App.3d 728, 736 [118 Cal.Rptr. 84].) Criminal defense attorneys have a " 'duty to investigate carefully all defenses of fact and of law that may be available to the defendant . . . .' " (*In re Williams, supra,* 1 Cal.3d at p. 175.) This obligation includes conferring with the client "without undue delay and as often as necessary . . . to elicit matters of defense . . . ." (*Coles* v. *Peyton* (4th Cir. 1968) 389 F.2d 224, 226.) "Counsel should promptly advise his client of his rights and take all actions necessary to preserve them. . . . Counsel should also be concerned with the accused's right to be released from custody pending trial, and be prepared, where appropriate, to make motions for a pretrial psychiatric examination or for the suppression of evidence. [Fns. omitted.]" (*United States* v. *DeCoster, supra,* 487 F.2d at p. 1203; *People* v. *Whittington* (1977) 74 Cal.App.3d 806, 818-819, fn. 6 [141 Cal.Rptr. 742].) ■ If counsel's failure to perform these obligations results in the withdrawal of a crucial or potentially meritorious defense,[15] " 'the defendant has not had the assistance to which he is entitled.' " (*In re Saunders, supra,* 2 Cal.3d at p. 1042.)

■ Of course, the burden of proving a claim of inadequate trial assistance is on the appellant. (*People* v. *Camden, supra,* 16 Cal.3d at p. 816.) Thus, appellant must show that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates. In addition, appellant must establish that counsel's acts or omissions resulted in the withdrawal of a potentially meritorious defense.

Once an appellant has met these burdens, the appellate court must look to see if the record contains any explanation for the challenged aspect of representation. If it does, the court must inquire whether the explanation demonstrates that counsel was reasonably competent and acting as a conscientious, diligent advocate. For example, where the record shows that counsel's omissions resulted from an informed tactical choice within the range of reasonable competence, the conviction must be affirmed. (E.g., *People* v. *Fain* (1969) 70 Cal.2d 588, 600 [95 Cal.Rptr. 562].) In contrast, where the record shows that counsel has failed to research the law or investigate the facts in the manner of a diligent and conscientious advocate, the conviction should be reversed since the

[15]A crucial defense is not necessarily one which, if presented, "would result inexorably in a defendant's acquittal." (*People* v. *Rodriguez* (1977) 73 Cal.App.3d 1023, 1028 [141 Cal.Rptr. 118]; accord *People* v. *Shells* (1971) 4 Cal.3d 626, 631 [94 Cal.Rptr. 275, 483 P.2d 1227].) *Ibarra* itself teaches that by failing to obtain an adjudication of the stronger of two potential defenses, trial counsel deprived his client of constitutionally adequate assistance. (60 Cal.2d at pp. 465-466.)

defendant has been deprived of adequate assistance of counsel. (E.g., *People* v. *McDowell* (1968) 69 Cal.2d 737 [73 Cal.Rptr. 1, 447 P.2d 97].)

In some cases, however, the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged. In such circumstances, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, these cases are affirmed on appeal.[16] (E.g., *People* v. *Miller* (1972) 7 Cal.3d 562, 572-574 [102 Cal.Rptr. 841, 498 P.2d 1089].) Otherwise, appellate courts would become engaged "in the perilous process of second-guessing." (*Id.,* at p. 573.) Reversals would be ordered unnecessarily in cases where there were, in fact, good reasons for the aspect of counsel's representation under attack. Indeed, such reasons might lead a new defense counsel on retrial to do exactly what the original counsel did, making manifest the waste of judicial resources caused by reversal on an incomplete record.

■ Where the record does not illuminate the basis for the challenged acts or omissions, a claim of ineffective assistance is more appropriately made in a petition for habeas corpus. In habeas corpus proceedings, there is an opportunity in an evidentiary hearing to have trial counsel fully describe his or her reasons for acting or failing to act in the manner complained of. (See Pen. Code, §§ 1483 and 1484; e.g., *In re Williams, supra,* 1 Cal.3d 168.) For example, counsel may explain why certain defenses were or were not presented. Having afforded the trial attorney an opportunity to explain, courts are in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence.[17]

---

[16]It has been said that an appellant must prove inadequate assistance as "a demonstrable reality and not a speculative matter." (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 661 [111 Cal.Rptr. 556, 517 P.2d 820].) This formulation of the heavy burden on a party alleging inadequate assistance was intended to summarize, in concise fashion, the rules just described: in the absence of an explanation in the record, appellate courts should not speculate that trial counsel's failure to present a particular defense resulted from incompetence. To justify relief, appellant must be able to point to something in the record showing that counsel had no satisfactory rationale for what was done or not done.

Although concise, the *Stephenson* formulation is subject to misinterpretation. The language demanding proof of incompetence as "a demonstrable reality and not a speculative matter" may be misunderstood to require inadequate assistance throughout the proceeding, when in fact, a single inexcusable error which withdraws a potentially meritorious defense is sufficient. (E.g., *People* v. *Shells, supra,* 4 Cal.3d 626.) To avoid such confusion, the *Stephenson* formulation should be replaced with the analysis of appellant's burden set forth in this opinion.

[17]To promote judicial economy in direct appeals where the record contains no explanation, appellate counsel who wish to raise the issue of inadequate trial representa-

### III

With these principles in mind, this court must determine whether appellant received the kind of legal assistance to be expected of a reasonably competent attorney acting as a conscientious, diligent advocate. ▮ Appellant contends that his trial counsel's representation was inadequate because she failed to use significant evidence of his mental deficiency. He asserts that given this evidence, a reasonably competent counsel would have taken one or more of the following steps: (1) sought a pretrial hearing to determine appellant's competence to stand trial (see Pen. Code, § 1368); (2) moved to suppress appellant's postarrest statements to police on the ground that appellant was mentally incapable of knowingly, intelligently and voluntarily waiving his *Miranda* rights; (3) introduced evidence of appellant's mental deficiency at trial—once having lost the pretrial suppression motion—in order to argue the insignificance of the inconsistent statements; and (4) developed and presented a defense of diminished capacity.

It is difficult to understand why the deputy public defender took none of these steps. Given the substantial record of appellant's mental retardation, these defenses were certainly crucial in the sense that they had potential merit. Particularly troublesome is counsel's failure to seek suppression of appellant's inconsistent statements to the police. Following a standard *Miranda* warning, the officer suggested to appellant that he "ha[d] a right to . . . clarify or explain [his] position in this matter." This

---

tion should join a verified petition for habeas corpus. (See, e.g., *People* v. *Apodaca* (1978) 76 Cal.App.3d 479, 489, fn. 3 [142 Cal.Rptr. 830].)

The dissent argues that resolution of claims of ineffective representation is preferable on direct appeal rather than in habeas corpus proceedings because the latter are both potentially duplicative and potentially harmful to the convicted defendant's claim. (Dis. opn., *post*, p. 440.) As indicated above, however, where the record does not illuminate the reasons for counsel's actions, reversal on appeal may often result in unwarranted retrials, a result serving neither justice nor economy.

As for the dissent's second rationale, the fact that a habeas proceeding "is not without its potential pitfalls" for convicted defendants does not lead to the conclusion that such proceedings should be avoided. The claim of ineffective assistance does not exist as a tool for reversing validly obtained convictions, but as a means of assuring that criminal defendants receive the legal assistance to which they are constitutionally entitled. Convictions should not be reversed on appeal because it might be discovered in a habeas proceeding that, to use the dissent's examples, the reason counsel did not call certain witnesses was either to avoid producing false testimony or to protect his client. Nonmeritorious claims of incompetent representation will be discouraged to the extent that there is an opportunity to determine the actual, as opposed to hypothesized, reasons for counsel's acts or omissions. That habeas corpus may be "a double-edged sword" is no reason why direct appeal should be made available as a shield for defendants with nonmeritorious claims of inadequate representation.

invitation to speak and appellant's "suggestibility" formed a strong basis for urging exclusion of the damaging statements. A reasonably competent and diligent counsel would ordinarily be expected to make such a motion.

Nonetheless, appellant's claim of inadequate assistance cannot be resolved on appeal. The record includes neither an explanation as to why counsel did not raise any of the potential mental defenses nor an indication that she was asked for an explanation.[18] This is not a case where this court can conceive of no satisfactory explanation for counsel's omissions. For example, the report of the appointed defense psychiatrist, which is not part of the record on appeal, may have included information upon which a diligent, conscientious and reasonably competent attorney would have chosen to forego any mental defense. In addition, appellant may have instructed trial counsel that he did not want records of his mental retardation introduced into evidence.

In view of the silence of the record on the reasons why no mental defense was presented, appellant's claim would be more appropriately made in a petition for habeas corpus. Indeed, if presented in a verified petition, appellant's allegations concerning the substantial mental defenses which were not offered would undoubtedly present a colorable claim entitling appellant to an evidentiary hearing. (See Pen. Code, §§ 1483 and 1484; *In re Hochberg* (1970) 2 Cal.3d 870, 873-874, fn. 2 [87 Cal.Rptr. 681, 471 P.2d 1].) At such a hearing, appellant would be able to produce evidence on matters merely alleged before this court.

■ Appellant next contends that he was denied competent representation because counsel did not interview or subpoena before trial the two other suspects, Harbin and Stoker. Appellant points out that the question

---

[18]This conclusion does not make "obiter dictum" of today's holding that an indigent criminal defendant is entitled to the assistance of a reasonably competent attorney acting as his diligent, conscientious advocate. (Dis. Opn., *post*, p. 431.) As set forth above, an analysis of a claim of inadequate trial representation necessarily begins by measuring counsel's performance against the applicable standard. Only where appellant identifies acts or omissions falling below that standard does an appellate court examine whether the record includes an explanation for the apparently inadequate representation. Thus, definition of the standard is a necessary element of today's decision.

Moreover, Justice Mosk apparently approves of the standard which this opinion has derived from *United States* v. *DeCoster, supra*, 487 F.2d 1197. (Dis. opn., *post*, p. 438.) Interestingly, after enunciating the standard in *DeCoster*, Judge Bazelon did not reverse the conviction but remanded the case for an evidentiary hearing where proof could be adduced as to counsel's explanations for his apparent inadequacy. (*DeCoster, supra*, at pp. 1204-1205.) Nonetheless, the dissent itself properly characterizes the *DeCoster* standard as the *holding* of that case. (Dis. opn., *post*, p. 438.)

of counsel's diligence in seeking to subpoena the two suspects was raised in the trial when counsel sought to introduce extrajudicial statements by the two men who were not present in court. At that time, counsel had an opportunity to describe fully her efforts to contact Harbin and Stoker, and she stated that her only attempts to reach them were by telephone. Appellant claims that such limited efforts precluded his obtaining potentially exculpatory evidence.

There is no doubt from the record that appellant's case was hastily prepared under intense time pressure. Trial counsel was assigned to the case only four working days before trial. During each of those days, she was occupied with hearings in other cases.

While it is clear that defense preparation was less than exemplary, appellant has not demonstrated constitutionally inadequate preparation on the limited facts available to this court. The trial judge found that the public defender's office had exercised due diligence in seeking to produce Stoker at trial. The record also indicates that the office had been trying to contact Harbin up until the time of the trial.

Further, defense counsel's statements about trying to telephone Harbin and Stoker were made in response to questions concerning her efforts to secure the two men as witnesses. Her statements in this regard do not preclude the possibility that she or some other member of the office made more substantial efforts to interview them as part of a pretrial investigation. Indeed, it is possible that another attorney or investigator actually interviewed one or both of the other suspects before trial and found that their testimony would not be favorable to appellant. Since the appellate record is ambiguous on this issue, the court cannot conclude that appellant has established that defense counsel conducted an inadequate investigation.[19]

The record reveals one other disturbing suggestion regarding the public defender's representation in this case. To explain her lack of success in trying to reach Harbin by telephone, counsel told the trial judge, "Harbin's a client of ours, and he knows we are representing Pope, and he is not answering our phone calls." From this statement an inference

---

[19]Appellant also asserts that counsel should have sought to suppress the wallet and $56 which were seized from appellant at the time of his arrest. He contends that the wallet was (1) the fruit of an illegal search and (2) irrelevant since the victim could not identify it. However, since the victim could not identify the wallet at trial, the "[f]ailure to object to admission of the items seized may have been . . . a strategic judgment that the items were not particularly damaging." (*People* v. *Steger, supra,* 16 Cal.3d at p. 552.)

arises that the public defender's office may have undertaken simultaneous representation of clients with conflicting interests.

Nonetheless, there are two compelling reasons for not resolving this issue at present. First, appellant's appointed counsel on appeal, who has vigorously challenged the other aspects of trial counsel's representation, has made no claim of any inadequacy based on a conflict of interest. Second, as already suggested, an evidentiary hearing is highly appropriate in this case if a verified petition for habeas corpus is filed. (See *ante,* p. 428.) In view of the likelihood of such a petition and the absence of any claim of conflict at trial or on appeal, this court is persuaded that resolution of this potential issue should await an evidentiary hearing in which all claims of inadequate assistance may be fully explored in a single proceeding.

The judgment is affirmed.

Tobriner, J., Richardson, J., and Manuel, J., concurred.

**CLARK, J.**—I concur in the judgment and in the opinion of the court insofar as it reaffirms the principle that a judgment of conviction may not be set aside on the basis of speculation, and that the claim of incompetence of trial counsel must be rejected on appeal when, as in this case, the record does not reveal counsel's reasons for acting or failing to act in the manner complained of. I concur in the dissenting opinion insofar as it contends that the discussion in the majority opinion as to the appropriate standard for resolving claims of incompetence of trial counsel is dictum. Therefore, I consider it neither necessary nor appropriate to address that issue at this time.

**MOSK, J.**—I dissent.

The majority, despite obvious misgivings, appear to believe they have no choice on the present record but to affirm the judgment of conviction. I conclude, to the contrary, that our only rational choice is to declare that the patent inadequacy of counsel was the equivalent of denial of counsel and to reverse the conviction of this borderline mentally defective defendant.

While I have no quarrel with the majority analysis of counsel incompetency problems, unfortunately their views have no binding effect.

Defendant Pope, found guilty of second degree robbery, appeals to this court for a reversal of his conviction. The majority, declaring the record inadequate to reveal incompetency of trial counsel, affirm the conviction. That is the only rule of law in this case. Any additional discussion of tests to weigh competency of counsel *if* the record had been adequate does not rise above mere obiter dictum.[1]

I am convinced that the record demonstrates the legal inadequacy of trial counsel under virtually any known test, that the lack of constitutionally adequate representation requires reversal of defendant's conviction and that we can devise and apply in the case before us a revised standard that will have precedential value.

I

Repetition of the facts surrounding the crime and the arrest contained in the record, some of which are recited in the majority opinion, is unnecessary, although they reveal to any alert counsel the potential defenses of *Miranda* violations and defendant's limited mental capacity. At the threshold the record discloses that this defendant received only superficial pretrial attention from his counsel, a fact that explains the obviously casual defense, including failure to attempt to subpoena the prime witnesses until after the trial was under way.

Two and one-half months before trial—ample time for preparation—the Sonoma County Public Defender was appointed to represent defendant. In multiple proceedings before the trial, the defendant was represented by four separate attorneys from that office, only one of whom appeared with him in any two different proceedings. Four working days before trial, a fifth attorney, a deputy public defender, was assigned to try the case. On each of those four days the deputy was involved in other hearings.

Before trial, the court appointed a psychiatrist to assist the defense. Although the augmented record on appeal does not include this psychiatrist's report, the record does contain the expert opinions of several psychologists and psychiatrists embodied in four separate reports made in 1973, 1975 and 1976, all being received post trial. These reports

---

[1]Dictum, however well-motivated at the time, frequently receives imperious treatment in subsequent decisions. See, e.g., disparaging references to an earlier opinion in *Hollister Convalescent Hosp. Inc.* v. *Rico* (1975) 15 Cal.3d 670, 671-674 [125 Cal.Rptr. 757, 542 P.2d 1349], using such expressions as "panoramic dicta," "erroneous dicta," "ill-considered dicta," "persistent dicta" and "unnecessary and overbroad dicta."

uniformly characterize defendant as a borderline mental defective with a fourth or fifth grade intellectual achievement level. His probation report filed on June 15, 1976, indicates he has an I.Q. of 72; this places him in the third percentile range when compared to I.Q. test standardization norms.

The reports, available to us on this appeal, note that defendant last attended school at the age of 17 when he was in the 9th grade. He was enrolled in "Special Education Classes for the mentally retarded throughout most of the period of his junior high school and high school attendance." The reports state that he "functioned intellectually like a child"; that he could not make change or drive a car; that he was gullible and suggestible; that he could not manage his own finances; that communication with him had to be couched in the "most elementary . . . vocabulary and sentence structure . . . if there is to be any expectation that he [will] understand"; and that he had a poor tolerance for ambiguity. Defendant was also characterized as having a "penchant for naive fabrications," and "a blanket denial mechanism"—a psychological, defense technique he used to justify himself. The evaluations also note his impaired memory, disoriented temporal sense, and limited attention span. In addition, they state he is easily manipulated by his age group peers, and that he displays the impaired judgment, immaturity, and impulsivity of a child.

The trial judge read and considered these evaluations after trial but before he ordered defendant committed for diagnosis. The record does not reveal whether the public defender, Ms. Young, obtained copies of the 1973 and 1975 evaluations before trial, or whether she knew of their existence at that time. There can be no doubt, however, that she was aware of the defendant's mental limitations because in her opening statement at trial she described him as having borderline intelligence. Nevertheless no evidence of defendant's limited intelligence was introduced at trial or used before trial to challenge the admissibility of his out-of-court statements to police or for any other purpose.

During the trial, the only defense presented was that the robbery was committed by the two other suspects, Harbin and Stoker. There was evidence that one of these two or both of them might have been involved in the robbery or that they were percipient witnesses with testimony of potentially enormous significance to the case: they were both in the bar at the same time as Brower, the victim; Harbin may have been sitting next to Brower in the bar and might have talked with him for 30 to 40 minutes

prior to the robbery; Harbin may have had ample opportunity to notice the money in Brower's wallet; both Harbin and Stoker followed Brower and defendant out of the bar; an investigating officer testified that both Brower and defendant had identified Harbin from a photographic lineup; Harbin had inadvertently made an inculpatory admission in the presence of another investigating officer; and both of them were listed in a police report as additional suspects. Defendant's counsel knew, or should have known, of the foregoing evidence. Nevertheless prior to trial she failed to subpoena either Harbin or Stoker.

During the trial, in cross-examining the police officer who had talked to Harbin and Stoker, defense counsel asked about the inculpatory statement Harbin was heard to make. When the prosecution successfully objected on the ground that such hearsay could not be admitted unless counsel made a showing that the declarant was unavailable, only then, at that late date, did Ms. Young ask that the trial recess to give her an opportunity to subpoena Harbin and Stoker. The next day, counsel produced Harbin and called him as a witness, but he invoked his Fifth Amendment privilege and Stoker was not located on such short notice.

The prosecution offered into evidence a statement defendant made, after he had purportedly waived his *Miranda* rights, containing certain inculpatory and inconsistent statements. No objection was made to the admissibility of these statements. In fact, during the trial, defense counsel made no substantial objections, called no significant witness on his behalf, and made no helpful motions for him either before, during or after trial. It is difficult to detect what role defense counsel played at the trial other than that of a casual observer.

In her opening statement, Ms. Young declared ". . . Mr. Pope has a borderline intelligence, *he does not understand a large percentage of what you are going to tell him* and he's very agreeable to go along with just about anything the police tell him. . . ." (Italics added.) Thus the record discloses defense counsel's knowledge of defendant's mental capacity existed from the very beginning of the trial. In closing argument, counsel argued that the only direct evidence that defendant participated in the robbery was the identification by Brower, who had been drinking before the crime occurred. She attempted to minimize Pope's inconsistent statements to the police by suggesting that they resulted from defendant's limited mental capacity. Thus, on the trial record, it is clear that counsel was aware of her client's mental limitations, although she had failed to present any evidence on the subject during the trial. As a result the court

curtailed the closing argument when the prosecution objected on the ground that no evidence had been introduced as to defendant's mental capacity.

The jury found defendant guilty of second degree robbery. Upon receiving the probation report, the trial judge ordered defendant committed for diagnosis pursuant to Penal Code section 1203.03. The court wrote the Director of Corrections in order to relate his concern for a defendant with a marginal mental capacity "who appears to be responsible for his actions in a purely legal sense, but that's about all." Following receipt of the diagnostic study and recommendation by the Department of Corrections, defendant was sentenced to state prison.

After sentencing, the court wrote the Director of Corrections again, this time to express concern over the conclusion of the diagnostic report that defendant's incarceration would be only a "temporary expedient" and that there was no reason to believe he would be more adaptive after it.

Thus it is clear that the defendant's mental condition was apparent even to the trial judge. Yet defense counsel made no motion in opposition to the sentence or the verdict, and made no comment on defendant's behalf at the time of sentencing.

To suggest that the foregoing—all in the record before us—does not reveal inadequacy of trial counsel is to trifle with reality. The majority term the defense preparation "less than exemplary." I deem it, beyond any doubt, less than adequate.

## II

The record reveals another ground, glossed over by the majority, for finding defense counsel's representation not only inadequate but improper. In explaining reasons for difficulty in obtaining Harbin's appearance, Ms. Young told the court: "Unfortunately, you see, *Harbin's a client of ours,* and he knows we are representing Pope, and he is not answering the phone calls." (Italics added.)

Since the defendant intended to, and did, attempt to blame Harbin and Stoker for the robbery, it should have been clear to members of the public defender's office that a conflict of interest existed. Manifestly the public defenders could not effectively represent a client who was implicating another client of their office in a serious felony. (Rule

5-102(B), Rules of Professional Conduct.) Indeed the court ultimately—though perforce late—recognized the conflict. After the public defender's investigator brought Harbin into court in an office automobile, the court appointed independent counsel "to represent Mr. Harbin and advise him regarding his testifying."

As a result, when defense counsel called their client, Harbin, to the stand, upon the advice of his new temporary court-designated attorney Harbin asserted his Fifth Amendment rights.

It is difficult, on this record, to see how defense counsel could adequately represent defendant, who desired to implicate Harbin, when up to the moment Harbin appeared in court he was represented by the same office. The patent conflict necessarily resulted in inadequate representation. (See *Glasser* v. *United States* (1942) 315 U.S. 60, 76 [86 L.Ed. 680, 702, 62 S.Ct. 457] ["The right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial."].)[2] Also see *Holloway* v. *Arkansas* (1978) 435 U.S. 475, 489 [55 L.Ed.2d 426, 438, 98 S.Ct. 1173] ["Joint representation of conflicting interests is suspect because of what it tends to prevent the attorney from doing."].

### III

Assuming, as we are permitted no alternative from the record, that defense counsel was well aware of defendant's mental limitations, we must consider whether some strategic purpose could have induced counsel to forego presentation of any testimony on the subject. It is difficult—indeed, I find it impossible—to conjure up any theory for the abandonment of what appears to be a ready-made defense: that the defendant did not have the mental capacity to form the intent to commit the offense with which he was charged, or to understand the nature of the acts which he admitted to the police, or to understand the potential

[2]With respect to conflicts of interest, it is clear that a public defender's office must be treated the same as a law firm. Thus, as one commentator has observed, "The reason for viewing the office of the public defender as a firm for purposes of ethical regulation is a sound one. . . . [T]he close association of the attorneys in the public defender's office makes it possible that confidential information will be inadvertently circulated. The necessity of utilizing the services of the same investigator, the inevitable discussions occurring in the office among the attorneys, and the overlapping sources of information from identical witnesses all contribute to this possibility. Furthermore, public confidence in the public defender and the Bar as a whole must be maintained. In order to do this, lawyers must 'not only avoid evil, but also the appearance of evil.' . . . By appointing separate attorneys for individual defendants where there is alleged conflict, the courts uphold not only the individual's constitutional rights and protections, but also the integrity of the entire criminal justice system." (Fns. omitted.) (Comment, (1977) 5 Fla.St.L.Rev. 492, 504-505).

consequence of his admissions. (But see Arenella, *The Diminished Capacity and Diminished Responsibility Defenses: Two Children of a Doomed Marriage* (1977) 77 Colum.L.Rev. 827.)

Nevertheless, if we assume arguendo that counsel had some shrewd, if well-concealed, tactical purpose in mind, still another problem emerges. Should counsel alone be permitted to abandon her client's clearly available and potentially effective defense, or should defendant be required, on the record, to waive that defense personally? A jury trial may be waived only by consent "expressed in open court by the defendant" *and* his counsel (Cal. Const., art. I, § 16). To enter a guilty plea we require recitation of a litany to demonstrate defendant is aware of, and personally waives, his several constitutional rights. Even in the less exacting civil context we have held that an attorney may bind his client in procedural matters "but he may not impair the client's substantial rights . . . ." (*Linsk* v. *Linsk* (1969) 70 Cal.2d 272, 276 [74 Cal.Rptr. 544, 449 P.2d 760].) He clearly may not eliminate an essential defense. (*Fresno City High School Dist.* v. *Dillon* (1939) 34 Cal.App.2d 636, 644 [94 P.2d 86].) Justice Traynor in *People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487], declared that withdrawal of a crucial defense denies defendant "the assistance to which he is entitled."

I suggest that in the circumstances at hand, if counsel had a legitimate purpose in waiving defenses based on defendant's mental limitations, she had a duty to spread on the record her abandonment of the defenses and to obtain defendant's personal acquiescence in the waiver. Failure to do so is further indication of counsel's inadequate representation of the defendant.

## IV

The farce, sham or mockery test, if it still exists intact, is due for revision. The expression—usually only two of the three terms are employed in any one case—is vague, uncertain, enigmatic, and results in denial of defendants' grievances in all but the most egregious circumstances, as, e.g., *People* v. *Corona* (1978) 80 Cal.App.3d 684 (hg. den.). As stated in *Scott* v. *United States* (D.C.Cir. 1970) 427 F.2d 609, 610, "That standard is no longer valid as such but exists in the law only as a metaphor that the defendant has a heavy burden to show requisite unfairness." The difficulty is in devising an alternative test.

Parenthetically, we need not decide in this case whether different standards apply to defendants who have retained counsel, as distin-

guished from those for whom the state has provided counsel. (Compare *Fitzgerald* v. *Estelle* (5th Cir. 1975) 505 F.2d 1334 (cert. den. (1975) 422 U.S. 1011 [45 L.Ed.2d 675, 95 S.Ct. 2636]) with *Moore* v. *United States* (3d Cir. 1970) 432 F.2d 730, 736; also see Note (1976) 89 Harv.L.Rev. 593.) Here counsel was court-appointed, which directly involves state action; thus we have no problem with prerequisites for considering questions of due process and right to counsel.

The United States Supreme Court has never relied on a sham or farce test, nor on any of that genre. In *McMann* v. *Richardson* (1970) 397 U.S. 759 [25 L.Ed.2d 763, 90 S.Ct. 1441], a case involving effective assistance of counsel on a guilty plea, the court spoke of "the range of competence demanded of attorneys in criminal cases" (*id.,* p. 771 [25 L.Ed.2d, p. 773]), but it did not define more precisely the acceptable range of competence demanded. Other federal courts—e.g., *Bruce* v. *United States* (D.C.Cir. 1967) 379 F.2d 113, 117—recognized that "It would not be fruitful to attempt further delineation of the applicable standard by reference to generalities, . . ." The applicable standard applied in *Bruce* was "gross incompetence of counsel and that this has in effect blotted out the essence of a substantial defense either in the [trial] Court or on appeal." (*Id.,* at pp. 116-117.)

Analysis of cases reveals that most attempts to define a standard with precision result in a frustrating tautology. For example, the so-called Maryland rule holds an accused has received incompetent counsel when, under all the circumstances of the case, the accused has not been afforded genuine and effective representation. (*Slater* v. *Warden, Maryland Penitentiary* (1966) 241 Md. 668 [217 A.2d 344, 346]; *Harris* v. *State* (Del. 1973) 305 A.2d 318, 319.) Other illustrations abound. (*People* v. *Camden* (1976) 16 Cal.3d 808, 815 [129 Cal.Rptr. 438, 548 P.2d 1110] [" ' "an extreme case must be disclosed" [citations]' (*People* v. *Ibarra* (1963) 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487]) in which counsel 'did not effectively supply to a defendant those skills and legal knowledge which we can reasonably expect from any member of the bar.' (*People* v. *Cook* (1975) 13 Cal.3d 663, 672-673 [119 Cal.Rptr. 500, 532 P.2d 148].)"]; *United States* v. *Reincke* (2d Cir. 1967) 383 F.2d 129, 132 ["so 'horribly inept' as to amount to a 'breach of his legal duty faithfully to represent his client's interests' "]; *Dillane* v. *United States* (D.C.Cir. 1965) 350 F.2d 732, 733 ["extraordinary inattention to a client's interests"]; *Hickock* v. *Crouse* (10th Cir. 1964) 334 F.2d 95, 100-101, cert. den. (1965) 379 U.S. 982 [13 L.Ed.2d 572, 85 S.Ct. 689] [requires "good-faith representation, with all the skill which counsel possesses"]; *Edgerton* v. *State of North Carolina*

(4th Cir. 1963) 315 F.2d 676, 678 ["not afforded in any substantial sense professional advice and guidance"]; *Cofield* v. *United States* (9th Cir. 1959) 263 F.2d 686, 688, sentence vacated (1959) 360 U.S. 472 [3 L.Ed.2d 1531, 79 S.Ct. 1430] [effective assistance "contemplates the conscientious service of competent counsel," not "mere perfunctory appearance"]; *Maye* v. *Pescor* (8th Cir. 1947) 162 F.2d 641, 643 ["an extreme case must be disclosed"]; *State* v. *Osgood* (1963) 266 Minn. 315 [123 N.W.2d 593, 600, fn. 2] [consultations must be "sufficiently adequate to inform the accused of all of his legal rights under the law and facts involved"]; see also *Chambers* v. *Maroney* (1970) 399 U.S. 42, 60 [26 L.Ed.2d 419, 433, 90 S.Ct. 1975] (Harlan, J., conc. and dis.) [whether, in the total picture, defendant was "deprived of rudimentary legal assistance"].)

Given the proliferation of standards, a serious question can be raised as to whether any precise standard is pragmatically helpful. No test yet proposed is self-determinative; all are deliberately vague and dependent upon subjective interpretation. It is inevitable that each will be applied in an ad hoc manner, with ad hoc results.

The American Bar Association has defined the lawyer's obligation in this manner: "The basic duty the lawyer for the accused owes to the administration of justice is to serve as the accused's counselor and advocate, with courage, devotion and to the utmost of his learning and ability, and according to law." (ABA Standards Relating to the Prosecution Function and the Defense Function (1971) p. 153.) The flaw in that definition is that the utmost of the attorney's learning and ability may still fall short of providing the defendant with the defense he needs and deserves.

In the final analysis, a readily adaptable standard for determining an unacceptable performance in a particular case should be stated in terms of reasonable competence. In rejecting a requirement of showing "gross incompetence," the court in *United States* v. *DeCoster* (D.C.Cir. 1973) 487 F.2d 1197, 1202, on appeal remanded the case to the trial court, holding that "a defendant is entitled to the reasonably competent assistance of an attorney acting as his diligent conscientious advocate."

The foregoing, though imprecise, is probably sufficient for guidance of the courts. Professor Strazzella explains the result: "The courts continue to reach for appropriate standards. There is a transition from the older standards to articulation of stricter but equally vague standards of performance. However, . . . the standards articulated for measuring

ineffective counsel may be necessarily and intentionally vague. This is probably one of those areas of the law, so rich in variables, in which the courts wish to avoid imposing rigid rules and probably could not devise a rigid list if they attempted to do so. The result leaves maneuvering room for the courts as they seek, in applying the standards, to assess each claim in the totality of the circumstances." (Strazzella, *Ineffective Assistance of Counsel Claims: New Uses, New Problems* (1977) 19 Ariz.L.Rev. 443, 454.)

With application to the case at hand, we need only to turn to *People* v. *McDowell* (1968) 69 Cal.2d 737 [73 Cal.Rptr. 1, 447 P.2d 97]. Our observations on that case fit the instant circumstances with remarkable relevance: "A defendant who pleads not guilty manifests his desire to contest the issue by every means lawfully at his disposal, and it is the duty of his counsel to assist him in this endeavor by the preparation and presentation of his defense. Under our adversary system, of course, the choice of strategy and tactics remains committed to counsel's judgment. Accordingly, in appropriate cases counsel may justifiably decide to offer no affirmative defense and stand instead upon the presumption of innocence; or counsel may, as here, offer a defense on one count only of a multiple charge, standing on the presumption as to the remainder. But either of these courses of action presupposes that counsel is fully informed of the defenses that could actually be interposed on behalf of his client. 'It is counsel's duty to investigate carefully all defenses of fact and of law that may be available to the defendant, and if his failure to do so results in withdrawing a crucial defense from the case, the defendant has not had the assistance to which he is entitled.' (*People* v. *Ibarra* (1963) *supra,* 60 Cal.2d 460, 464, and cases cited.)

"It is settled in this state that on the trial of the issues raised by a plea of not guilty to a charge of a crime which requires proof of a specific mental state, competent evidence is admissible to show that because of mental abnormality not amounting to legal insanity the defendant did not possess that mental state at the time he committed the act. As we said of the search and seizure principle involved in *People* v. *Ibarra* (1963) *supra,* 60 Cal.2d 460, 465, 'This rule should be a commonplace to any attorney engaged in criminal trials.' It was established almost two decades ago: 'the defense, generally, has been well recognized since *People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53].' (*In re Hawley* (1967) 67 Cal.2d 824, 829 fn. 4 [63 Cal.Rptr. 831, 433 P.2d 919].) It was further developed in *People* v. *Gorshen* (1959) 51 Cal.2d 716 [336 P.2d 492], and has frequently been discussed in appellate opinions, in law review articles, and in the standard works of reference. 'It can no longer be doubted that the defense

of mental illness not amounting to legal insanity is a "significant issue" in any case in which it is raised by substantial evidence. . . .' " (*Id.,* at pp. 746-747.) To the same effect see *United States* v. *Brawner* (D.C.Cir. 1972) 471 F.2d 969, 998.

## V

The claim of ineffective trial counsel is preferably to be litigated on direct appeal in all cases in which the record includes sufficient information to do so. (Brody & Albert, *Ineffective Representation as a Basis for Relief from Conviction: Principles for Appellate Review* (1977) 13 Colum. J. L. & Soc. Prob. 1, 87 ["Every effort should be made to deal with the claim on direct appeal rather than in a collateral proceeding . . . ."]; Bines, *Remedying Ineffective Representation in Criminal Cases: Departures from Habeas Corpus* (1973) 59 Va.L.Rev. 927, 939-940 fn. 66; see also Strazzella, *Ineffective Assistance of Counsel Claims: New Uses, New Problems* (1977) 19 Ariz.L.Rev. 443, 460.) This avoids the necessity of a second proceeding, with potentially duplicative hearings and appeals, and with the resultant burden on the judicial process.

There is an additional reason why resort to the trial record is preferred to institution of separate habeas corpus proceedings.

A petitioner for habeas corpus may learn, to his sorrow, that by opening up the issue of his trial attorney's ability in a new proceeding he waives much of the attorney-client privilege. A trial attorney whose competence is assailed by his former client must be able to adequately defend his professional reputation, even if by doing so he relates confidences revealed to him by the client. For example, the attorney who is criticized for failing to call alibi witnesses to the stand should be permitted to explain that the client admitted to him he was at the scene of the crime and that the alibi was fabricated. Counsel should also be allowed to explain that other witnesses not produced might, under cross-examination, have implicated the client in other uncharged criminal activities.

In short, those who exercise 20/20 hindsight and instigate separate proceedings to assail the performance of trial attorneys must realize that the procedure is not without its potential pitfalls. The sword may be double-edged, both of them blunt. Resort to such proceedings should consequently not be judicially required in cases such as the one before us,

because the record clearly reveals that counsel's representation was ineffective and therefore makes it possible to avoid these pitfalls.

For all of the foregoing reasons I reject the majority's invitation for a whole new round of duplicative litigation. On the present record I would reverse the judgment and remand for a new trial in which the defendant would have adequate representation.

Newman, J., concurred.

Appellant's petition for a rehearing was denied March 28, 1979, and the opinions were modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.