Filed 4/28/15  P. v. Quon CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E060223 |
| v. | (Super.Ct.No. FWV1000501) |
| MARVIN SHI YUEN QUON, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Stephan G. Saleson, Judge.  Affirmed.

Lee W. Gale for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, and Barry Carlton, Deputy Attorney General, for Plaintiff and Respondent.

## I.  INTRODUCTION

During a fight with his neighbor, defendant and appellant, Marvin Shi Yuen Quon, stabbed the neighbor seven times with a tire repair tool.  The district attorney charged

him with one count of assault with a deadly weapon (Pen. Code, § 245, subd. (a)(1)), and alleged that he personally inflicted great bodily injury within the meaning of section 12022.7, subdivision (a). A jury convicted defendant of the charged crime and found the enhancement allegation not true. Defendant was sentenced to 36 months' probation on the condition (among others) that he serve 180 days in custody, 90 days of which would be on work release.

On appeal, defendant contends he was deprived of his Sixth Amendment right to effective assistance of counsel. He further contends his sentence was erroneously based on a finding the jury had specifically found not true. We reject these arguments and affirm the judgment.

## II. FACTUAL AND PROCEDURAL SUMMARY

A. *Prosecution Evidence*

Defendant and Richie Cattilini were next door neighbors. On February 5, 2010, Cattilini was unloading groceries from his truck when defendant drove by in his Hummer. Defendant flipped Cattilini off and mouthed obscenities toward him. Cattilini did not say anything to defendant or gesture toward him.

After defendant parked his vehicle, Cattilini walked to the sidewalk in front of defendant's house and asked defendant "what his problem was." Defendant told Cattilini he was "an asshole." Cattilini had his hands in his pocket because he did not want to appear threatening. He did not have a weapon.

2

The two began arguing. Defendant told Cattilini "he was going to kick [Cattilini's] ass"; Cattilini responded, "Well, I'm standing right here." After more words were exchanged, defendant gestured to Cattilini to come onto his property. When Cattilini approached, defendant pointed out a security camera that was recording their interaction.

Defendant repeatedly asked Cattilini to hit him. Unbeknownst to Cattilini, defendant held a weapon behind his back in his left hand.

As Cattilini turned and began to walk away, defendant followed him and pushed Cattilini's right shoulder. Cattilini continued to walk away. Defendant then hit Cattilini in his lower back. Cattilini turned and told defendant to "keep his fucking hands off" him. Defendant then hit Cattilini in the abdomen and neck. Cattilini responded by hitting defendant in the face, knocking defendant off balance.

Defendant lunged at Cattilini, striking him in the neck and abdomen. Cattilini hit defendant in the face a second time, knocking defendant to the ground. Cattilini backed away. Defendant got up and lunged at Cattilini again.

The fight moved into the street. Cattilini told defendant to stop, but defendant continued to throw punches.

Cattilini noticed blood coming from underneath his shirt near his waistband. He then saw a "steel shaft" in defendant's hand and realized that defendant had been stabbing him. At that point, Cattilini went to his house and called 911.

3

Cattilini suffered four puncture wounds in his abdomen, one in his neck, and two in his right hand. A treating physician testified that one of the stab wounds penetrated Cattilini's abdominal cavity. He said that the weapon went up to the tissue that covers the kidney, but did not penetrate the kidney. If it had, it could have caused Cattilini's death.

Two silent video recordings of the incident, one in slow motion and one in "full speed," were played to the jury. The actions shown are consistent with Cattilini's description of the event.

Riverside County Deputy Sheriff Anthony Thomas interviewed defendant. Defendant identified a "tire tool" he used to "jab" Cattilini during the fight. Deputy Thomas and two other deputies testified that although defendant spoke with them about the altercation on the day it occurred, defendant did not tell the officers that he believed Cattilini had a gun or weapon of any type that day. Nor did defendant mention to any of the deputies that Cattilini had ever threatened to kill defendant's family or tried to get into defendant's home.

B. *Defense Evidence*

Defendant's daughter Peggy testified that there were bad feelings between defendant and Cattilini because Cattilini was a "racist." He would call defendant "'a stupid Chinaman'" and cuss at defendant.

On the day of the altercation, Peggy and a friend were in defendant's car as they pulled up to their house. She did not see defendant "flip off or say anything derogatory to

4

Mr. Cattilini." As they pulled into their driveway, Cattilini followed them to the sidewalk in front of their house. Cattilini had his hands in his pockets and yelled, "'Marvin, Marvin, Marvin.'" Defendant told Peggy and her friend to go inside the house, which they did. Peggy watched the fight from inside the house. She described Cattilini as "threatening" and said she was personally afraid of him. She saw Cattilini kick defendant, then saw them fighting.

Defendant testified that the animosity between him and Cattilini began shortly after he moved to the neighborhood in December 2003. He described disputes involving complaints by Cattilini concerning defendant's dogs, defendant's alleged use of a jackhammer on an Easter Sunday morning, and water draining from defendant's property onto Cattilini's property. Defendant referred to incidents in which Cattilini used racial slurs against him, such as "stupid Chinaman" and "fucking chink." Cattilini also threatened to kill defendant's family. Defendant bought a fire escape ladder and a security camera because he feared for his life. He also said he is certified in Tai Chi, a self-defense discipline.

Regarding the events of February 5, 2010, defendant said he did not flip off Cattilini or cuss at him. After parking in his garage, he heard Cattilini say "'Marvin, Marvin, Marvin.'" Cattilini had his hands in his pockets, which made defendant believe Cattilini had a weapon. Defendant armed himself with the tire repair tool because he believed Cattilini had a weapon in his pocket and "just in case . . . something happened." Defendant is right-handed and held the tool in his left hand.

5

Defendant did not ask Cattilini to come onto his property; rather, Cattilini told defendant to come to him so that, as defendant put it, "he can kick my chink ass." Defendant told him, "You want to kick my ass?  Come here.  I'm here."  Cattilini then came toward defendant in an aggressive manner.  Defendant pointed out the security camera to Cattilini and told him, "'don't do anything stupid.'"  He put the tire repair tool behind his back so that Cattilini would not "see [his] weapon."

When defendant told Cattilini to get off his property, Cattilini kicked defendant in his thigh.  A physical fight ensued in which Cattilini struck defendant and defendant used his hands to block defendant's punches.  The only part of Cattilini's body defendant made contact with was Cattilini's hand.

## III.  DISCUSSION

### A.  *Right to the Effective Assistance of Counsel*

Defendant contends he was denied his constitutional right to the effective assistance of counsel.

"Under both the Sixth Amendment to the United States Constitution and article I, section 15, of the California Constitution, a criminal defendant has the right to the assistance of counsel."  (*People v. Ledesma* (1987) 43 Cal.3d 171, 215.)  "In order to demonstrate ineffective assistance of counsel, a defendant must first show counsel's performance was 'deficient' because his 'representation fell below an objective standard of reasonableness . . . under prevailing professional norms.'  [Citations.]  Second, he must also show prejudice flowing from counsel's performance or lack thereof.  [Citations.]

6

Prejudice is shown when there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' [Citations.]" (*People v. Jennings* (1991) 53 Cal.3d 334, 357; see *Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

Our review of counsel's performance is "highly deferential" (*Strickland v. Washington, supra,* 466 U.S. at p. 689), and "there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' [Citation.]" (*People v. Lucas* (1995) 12 Cal.4th 415, 437.) The burden of overcoming this presumption "is difficult to carry on direct appeal . . . : '"Reviewing courts will reverse convictions [on direct appeal] on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for [his or her] act or omission."' [Citation.]" (*Ibid.*) If "the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged," the claim on appeal must be rejected "unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation . . . ." (*People v. Pope* (1979) 23 Cal.3d 412, 426, fn. omitted; accord, *People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.)

Defendant identifies numerous instances in which his trial counsel was allegedly deficient. We address each in turn.

First, defendant asserts that counsel promised in his opening statement that he would present a version of the facts that contradicted Cattilini's version and produce "'four or five witnesses'" to demonstrate the difference; but counsel ultimately produced only two witnesses. We reject this argument. Defendant's trial counsel actually said he would produce "*probably* four or five witnesses," and qualified that by saying that he did not want to be cumulative or "repeat the same information from four sources, because that's really counterproductive." (Italics added.) He further explained that "even though I say we have five witnesses, you may not hear five witnesses because I have to judge as an attorney and as an advocate of [defendant] at what point have I made my point."

By producing only two witnesses, counsel may have determined, as he indicated he might, that he had made his points with the two witnesses he produced and that additional witnesses would have been cumulative and counterproductive. Because there could be a satisfactory reason why counsel did not call additional witnesses, this claim must be rejected. (See *People v. Pope, supra,* 23 Cal.3d at p. 426.)

Next, defendant states that counsel promised to produce, and did produce, evidence related to certain prior disputes between the neighbors, "which was in no way relevant to the incident here involving an assault." He refers us to evidence regarding a drainage dispute, a dispute regarding a real estate transaction involving defendant and Cattilini's wife, and a complaint by Cattilini regarding defendant's alleged use of a jackhammer. However, counsel may have offered such evidence to contradict Cattilini's testimony regarding these prior events to damage Cattilini's credibility—if Cattilini lied

8

about these prior incidents, perhaps he was lying about the assault. Even if such evidence was irrelevant, defendant fails to explain how the presentation of such irrelevant evidence was prejudicial.

Defendant further argues that his trial counsel promised to produce two Asian witnesses who would testify about their feelings toward Cattilini. Counsel was deficient, he contends, because such evidence was irrelevant and he failed to produce the promised witnesses. Initially, we note that if, as he asserts, the promised evidence was irrelevant, he cannot complain that the evidence was not introduced; counsel cannot be constitutionally deficient by failing to introduce irrelevant evidence. If he is complaining that counsel should never have promised to produce the irrelevant Asian witnesses, he has failed to explain how the decision prejudiced him in any way.

Defendant next contends that his trial counsel promised to produce the testimony of defendant's wife, but failed to do so. The record does not disclose why defendant's wife did not testify. It is possible that, after the testimony of defendant and defendant's daughter, counsel realized that the testimony of defendant's wife would have been cumulative and, as he put it, counterproductive. It is also possible that defendant's wife decided she did not wish to testify, or that defendant did not want her to testify. Because there are possible satisfactory reasons why defendant's wife was not called to testify, we reject the claim. Moreover, there is nothing in the record to indicate that defendant's wife saw the fight between the neighbors or had anything pertinent to say. We cannot,

9

therefore, determine that the decision not to call her as a witness was prejudicial in any way.

Defendant next argues that his counsel was deficient by complimenting the prosecutor on his closing argument. He points to the following, which counsel stated near the outset of his closing argument: "I complimented [the prosecutor] on a very excellent, excellent closing argument. I've never seen a better one. After 43 years, that's the best I've ever seen. I compliment him. I think he's a fine prosecutor, and I am not going to argue strenuously about what he has said." Later, he referred to the prosecutor's "admirable job" in presenting the People's case.

Defendant offers no authority for the assertion that an attorney is constitutionally deficient when he or she compliments the opposing counsel. Moreover, as the Attorney General points out, there may have been tactical reasons for doing so. By complimenting the prosecutor on his closing argument, defense counsel may have suggested that the apparent strength of the prosecution's case was the attorney's performance, not the truth of the charges. Counsel may also have decided to acknowledge what the jurors may have been thinking—that the prosecutor's performance was indeed excellent—thereby enhancing his own credibility in the jurors' eyes. Because there could be satisfactory reasons for complimenting the prosecutor, and defendant has failed to make any showing of prejudice from such comments, we reject this claim.

Defendant next claims that his trial counsel misstated Cattilini's testimony. In his closing argument, defense counsel discussed the video equipment defendant had

10

installed, then stated: "Now, on the same token, there was testimony on the part of Mr. Cattilini that he, too, had video—I'm sorry—camera equipment. We don't know what type, if it was video or whatever . . . ." Defendant claims that this is incorrect because Cattilini testified that he did not install a camera to take pictures of defendant's property. We agree with the Attorney General that the misstatement of fact was minor. Indeed, after the statement, counsel immediately moved on to other matters. It does not appear to have played any meaningful part in the closing argument. On appeal, defendant merely asserts the misstatement without any explanation of how it is deficient or prejudicial. He has failed to establish either.

Defendant next contends that trial counsel used the phrase "self-defense" only twice in his closing argument, even though self-defense was a key component of the defense theory. In the same vein, trial counsel failed to discuss the evidence that defendant was trained in martial arts for self-defense. We reject these arguments. Reviewing the argument in its entirety, we cannot conclude counsel's performance was constitutionally deficient. Although counsel may have uttered the phrase "self-defense" only twice, his argument was focused largely on establishing reasons why defendant feared Cattilini and portraying Cattilini as a racist aggressor in order to characterize defendant's actions as defensive. Ultimately, counsel's argument led to his discussion of the self-defense instruction and, in particular, the part that stated: "'If you find that Richie Cattilini threatened or harmed the defendant or others in the past, you may consider that information in deciding whether the defendant's conduct and beliefs were

11

reasonable.'  Someone who has been threatened or harmed by a person in the past is justified in acting more quickly, taking greater self-defense measures against that person."  (See CALCRIM No. 3470.)  Counsel's failure to discuss defendant's martial arts training may have been a tactical decision based on the possible perception that it would portray defendant as an aggressor.

Defendant was sentenced on December 20, 2013, to three years' probation on the condition that he serve 180 days in custody, to begin on January 8, 2014.  The 180 days was evenly split between jail and work release.  When he appeared on January 8, 2014, his counsel asserted that defendant was "under observation for a number of things having to do with his heart" and was on an "insulin required program."  He requested that defendant's custody begin with electronic monitoring.  The court noted that it had not been told about any medical conditions at the time of sentencing.  The court further stated:  "We have doctors available in the jail, and if [defendant] needs medical assistance, I am certain he will get it.  If for some reason he doesn't get the service that's needed, he can let you know, [counsel].  You will let me know, and we'll go from there."

On appeal, defendant contends that counsel should have raised his medical issues at the time of sentencing.  Even if defendant's medical conditions should have been raised earlier, defendant fails to establish any prejudice.  As the court stated, there are doctors available to the inmates and defendant would receive medical assistance if he needed it.  There is no reason to believe that the court's sentencing order would have been any different if the issue had been raised earlier.

12

Finally, defendant states that "[c]ounsel was untimely in filing papers, and neglected to file a pre-trial brief, witness or exhibit list, or any pre-trial motion. Counsel further neglected to advocate for a jury instruction on lesser included offenses which may have mitigated the [defendant's] felony exposure." These assertions are made without any citations to the record, without identifying any possible pretrial motions or lesser included offenses, and without any discussion of how the alleged failures resulted in prejudice. We cannot, therefore, evaluate the merits of these claims.

B. *Sentencing: Court's Reference to Great Bodily Injury Likely*

At the sentencing hearing, the court stated the following: "You will be placed on formal probation, [defendant], for three years, sir, for Assault with a Deadly Weapon, not a firearm, great bodily injury likely . . . ." Defendant contends the court's reference to "great bodily injury likely" was error because the jury found not true the enhancement allegation that he personally inflicted great bodily injury upon Cattilini.

As the Attorney General points out, defendant did not object to the court's statement at the sentencing hearing. The claim is therefore forfeited on appeal. (See *People v. Scott* (1994) 9 Cal.4th 331, 353.) Even if it was not forfeited, we would reject it. The court's statement appears to be based on the probation report, which refers to defendant's crime of "Assault With a Deadly Weapon, Not Firearm, or Force: Great Bodily Injury Likely, in violation of [Penal Code] Section 245[, subdivision] (a)(1) . . . ." This, in turn, appears to be a reflection of the title of the statute defendant violated, Penal Code section 245, which states: "Assault with deadly weapon or force likely to produce

13

great bodily injury . . . ." The probation report makes clear, however, that "the jury did not find the enhancement of great bodily injury true." It therefore does not appear that the probation officer or the court based the sentence upon a misperception that the enhancement allegation was found true.

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING                              
                                        J.

We concur:

RAMIREZ                    
                    P. J.

McKINSTER              
                    J.

14