Filed 12/8/15  P. v. Saavedra CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H041166 |
| Plaintiff and Respondent, | (Santa Cruz County Super. Ct. No. F26297) |
| v. | |
| JAIME SAAVEDRA, | |
| Defendant and Appellant. | |

Defendant Jaime Saavedra was convicted by a jury of one felony count of assault by means likely to produce great bodily injury (Pen. Code, § 245, subd. (a)(4))[1] and one misdemeanor count of assault (§ 240).  The trial court sentenced Saavedra to the middle term of three years, suspended, on the felony conviction and granted probation, subject to conditions including serving 360 days in jail.

On appeal, Saavedra raises the following arguments:  (1) his trial counsel was constitutionally ineffective for failing to exclude certain portions of Saavedra's interview with police following his arrest; (2) the trial court improperly punished him for exercising his right to a trial by imposing a harsher sentence than was offered to him before trial; and (3) the trial court erred by failing to award custody credits.

We find no merit to Saavedra's first two arguments, but find the trial court erred in awarding credits.  Because there is insufficient information in the record which would

---

[1] Unspecified statutory references are to the Penal Code.

permit this court to calculate the appropriate amount of credits, we will reverse and remand for resentencing only on that issue.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     *Charges against Saavedra*

On March 25, 2014, the Santa Cruz County District Attorney's Office filed an amended information alleging Saavedra in counts 1 and 2 committed felony assault by means likely to produce great bodily injury (§ 245, subd. (a)(4)), and in count 3 committed misdemeanor battery on a cohabitant (§ 243, subd. (e)(1)).

### B.     *Testimony and evidence presented at trial*

#### 1.     *The victim's testimony*

Saavedra first met the victim at Alcoholics Anonymous meetings sometime in 2011 or 2012. On October 31, 2013, the victim was taking her 10-year-old son trick or treating when she randomly encountered Saavedra on the street. They began dating shortly thereafter. Although Saavedra never moved in with the victim, he would stay over at her house up to five nights a week and sleep in her room.

Sometime around Christmas that year, Saavedra and the victim went to a Walgreens together. Saavedra waited in the car with the victim's son as she went inside. When she came out of the store, she saw a woman standing next to Saavedra, holding his arm through the driver's side window. The woman seemed angry and asked the victim if she was Saavedra's girlfriend. The victim did not respond, but Saavedra told the woman the victim was "just his friend."

The other woman asked the victim again if she was Saavedra's girlfriend and she said she was. When the victim asked the woman who she was, the woman responded that she was Saavedra's girlfriend and had been for 10 years. The victim and Saavedra left the store together, although the victim was confused by what had happened.

Later that evening, as the victim and Saavedra were getting ready for bed, she confronted him about the woman at Walgreens. She felt Saavedra was lying to her

2

because the woman at the store was under the impression she was his girlfriend. The victim told Saavedra she no longer wanted to be with him. Saavedra suddenly put his hands around her throat and started choking her. He had his thumb on her windpipe and she started to black out. The victim thought she was going to die, but once she started losing consciousness, Saavedra immediately let go of her.

The victim tried to remain calm "so that it would just be over" and Saavedra apologized, saying he did not know what he was doing. Saavedra had been very angry and, although the victim was scared, she did not call the police. The victim did not think Saavedra would do it again, so they continued dating.

Toward the end of January 2014, the victim and Saavedra were in her bedroom, arguing. She told him she did not want to be with him anymore and tried to get up from the bed. Saavedra grabbed her arms and held her down on the bed. He told her she had better not leave him for her ex-boyfriend who lived across the street or he would kill both of them. Saavedra said he would slice open their stomachs and disembowel them. When the victim responded that Saavedra would go to jail if he did that, Saavedra told her he would knock all her teeth in and put her where the police would not find her. He would be gone before anyone even knew to look for him.

The victim felt threatened and scared, and was struggling to get up from the bed. Saavedra suddenly got off her, grabbed a folding chair, and pressed it down on her, with the chair's metal bar against her forearms. The victim yelled for her friend, who was in the living room, to help her. Saavedra got off of the victim before her friend came in. The victim had bruises on her upper arms and forearms,[2] photographs of which were shown to the jury and admitted into evidence. However, the victim again did not call the police nor did she follow through immediately on breaking up with Saavedra.

---

[2] The victim admitted that, because of various medications she takes, she tends to bruise very easily.

Approximately a week later, on February 3, 2014, the victim was arguing with Saavedra over the telephone. The victim accused Saavedra of stealing items from her apartment, including a toy radio-controlled helicopter which her son had just received as a Christmas present. Saavedra admitted taking the helicopter but claimed it was broken and he was going to repair it. Saavedra told the victim he was going to come over and that he was "gonna be mad." The victim was afraid Saavedra would hurt her, so she called a long-time friend, Philip Brewer, to come over in case Saavedra did anything to her.

When Saavedra showed up at her house, the victim said she did not want to be with him and Saavedra told her he was going to hurt her. He reached into his pocket, where the victim knew he carried a knife. Saavedra "motioned with his fist like he had a knife in his hand" and hit her in the throat with his fist as if he were stabbing her. Saavedra did not actually have a knife in his hand, however.

He pushed her down onto the couch with his fist still pressed against her throat and she could not get up with Saavedra on top of her, with one knee on her back. The victim struggled to breathe and was trying to tell him to stop and not hurt her. She started to lose consciousness and thought Saavedra would not stop choking her. The victim urinated on herself and Saavedra finally let go of her.

The victim told Saavedra to leave but he refused, asking why she wanted him to go and acting as if he had done nothing wrong. They continued to argue for a few minutes when Brewer arrived and got Saavedra to leave.

The victim testified that, during the course of her four or five month relationship with Saavedra, he may have once expressed doubts about "the way things were going, but he never left." Saavedra was not trying to break up with her, however, during the three occasions where he injured her. The victim further explained that, although her 10-year-old son was in his room for each incident, he is deaf and could not hear what transpired elsewhere in the home.

4

On cross-examination, the victim said that Saavedra and her son did not have a good relationship because Saavedra would get overly rough when playing or wrestling with him, causing her son to cry.

### 2. *Brewer's testimony*

Brewer testified the front door was open when he arrived at the victim's residence, so he walked in. He saw Saavedra holding the victim's arm as they argued in her living room. Brewer told Saavedra several times he needed to leave, but Saavedra kept "getting very verbal, very angry" and would not listen to Brewer. Brewer stepped between the two of them and Saavedra redirected his anger at Brewer.[3] At that point, Brewer grabbed Saavedra and pushed him out the door.

Saavedra was cursing at Brewer and telling him he loved the victim. When Brewer said the victim did not want to be with Saavedra, Saavedra said "Fuck that. I'll kill her." Brewer told him to just leave, and Saavedra threatened to kill Brewer and his family. After about 10 minutes of Saavedra crying and arguing, Brewer finally got him outside onto the steps and Saavedra left.

Saavedra soon returned, carrying a backpack. Brewer saw Saavedra reaching inside the backpack, so he grabbed the backpack away from him as Brewer thought Saavedra may have a weapon. Inside the backpack, Brewer saw the butt of a gun, which turned out to be an "airsoft gun." Brewer again convinced Saavedra to leave.

Brewer encouraged the victim to contact the police, and Brewer's wife drove her to the police station in Watsonville.

---

[3] Brewer testified he is 6 feet 2 inches tall and weighs approximately 270 pounds. Saavedra is around 5 feet 6 inches tall and weighs around 150 pounds.

### 3. *Corporal Ed Delfin's testimony*

After the victim arrived at the Watsonville police station, she met with Corporal Delfin and told him what Saavedra had done to her. Delfin took photos of the victim documenting her injuries, which were shown to the jury.

Delfin later contacted Saavedra at his home and placed him under arrest. Saavedra was taken to the police station, where Delfin read him his *Miranda*[4] rights, which Saavedra waived. Saavedra's recorded interview with Delfin was played for the jury.

In that interview, Saavedra said the victim was his girlfriend, but when he told her he wanted to just be friends, she just went "nuts." According to Saavedra, the victim was dealing methamphetamine. Lots of people came to her house and Saavedra saw "a lot of dope."

Saavedra denied hurting the victim. He believed she was afraid he would tell the police she was dealing methamphetamine.[5] He did not choke her, but was trying to sit down next to her on the couch. Saavedra only grabbed the victim by the waist to get her to sit down next to him. She curled into a ball and urinated on herself. Saavedra thought that the victim had been "hurt in the past" in "previous relationships" and that was why she got so scared she lost control of her bladder. Saavedra got up to leave and was walking out the door when one of the victim's friends arrived.

Saavedra insisted he was the one who was trying to leave, and when asked why the victim had bruises on her arm, replied "I must have tried to hold her down too [*sic*] like—like stop, like told her to stop . . . listen to me." He repeatedly denied "beat[ing] [the victim] up," saying "I may have hurt her mentally but physically I did not do it."

---

[4] *Miranda v. Arizona* (1966) 384 U.S. 436.

[5] The victim admitted on direct examination she was convicted in 2009 for misdemeanor possession of stolen property.

Saavedra asked Delfin, "[D]oes it make sense what I'm saying to you? That she was in control of something that scared her for me knowing?" Delfin responded "[Y]our story makes no sense whatsoever." Saavedra continued, "Just because I know what she does, it scares her. Does that make sense? I know that she sells meth, a lot. And a lot of people go over to her house, especially guys and I was just trying to leave as a friend. And instead of just walking out and not saying a word I was trying to tell her you know I just want to be your friend and I—I don't want no problems. But obviously there's a problem 'cause she said that I hurt her when I didn't. Well I mentally hurt her."

Delfin photographed Saavedra's hands and arms. Two of those photographs were displayed to the jury. Delfin said he could not see any injuries to Saavedra in either of the photos, and said that it was normal "policy and procedure to photograph . . . the suspect or the perpetrator to see what injuries that person does or doesn't have."

During the interview at the police station, Delfin served Saavedra with an emergency protective order, read its terms to him and asked if Saavedra understood them. Saavedra said he did.

At trial, Delfin testified that emergency protective orders were only issued in domestic violence cases where there was probable cause to arrest a person, not merely because someone has made an accusation.

### 4. *Gloria Fernandez's testimony*

Fernandez testified she first met Saavedra 10 years ago. They were friends at first, then dated, but have been just friends again for the past three years or so. On March 3, 2010, she and Saavedra were going out to dinner. Fernandez was driving, and Saavedra was angry because he thought the restaurant would be closed. They argued, and Saavedra threw a glove at her, hitting her in the face. Fernandez said she suffers from depression and forgets things. The prosecutor asked if she remembered Saavedra slapping her in the face while driving to the restaurant, but she said she did not remember that. She also could not remember what else Saavedra did to her face, if he was her

7

boyfriend at the time, or her felony conviction in 2002 for theft. Fernandez did not call the police about the incident, but she thought perhaps others at the restaurant did.

### C.    *Verdict and sentencing*

On March 28, 2014, a jury found Saavedra guilty as charged on count 2 and guilty of the lesser included offense of misdemeanor assault in violation of section 240 on count 3. The jury could not reach a verdict on count 1 and the trial court declared a mistrial on that charge.[6]

On May 15, 2014, the court sentenced Saavedra to the midterm of three years for count 2, suspended the sentence, and granted probation subject to conditions including serving 360 days in jail, consisting of 180 days each for counts 2 and 3. The trial court noted that Saavedra "has twelve days total credit."[7]

## II.    DISCUSSION

### A.    *Trial counsel was ineffective*, *but the failure was not prejudicial*

Saavedra contends his trial counsel rendered constitutionally ineffective assistance when she failed to exclude the police interrogation of him because that interrogation contained Delfin's opinions on his credibility and guilt, as well as Delfin's vouching for the victim's credibility. The interrogation also included a discussion of the emergency protective order, which was both irrelevant and highly prejudicial. We agree that counsel was ineffective, but conclude it is not reasonably probable Saavedra would have obtained a more favorable result in the absence of counsel's failings.

---

[6] Count 1 was ultimately dismissed by the trial court in the interest of justice at Saavedra's sentencing hearing.

[7] The probation report indicates Saavedra has "12 days" of "custody credit." It does not however list the dates in which he was in custody, nor does it make any provision for "actual custody credits" versus "conduct credits" under section 4019.

### 1. Relevant facts

Before trial, the court granted Saavedra's in limine motion to "exclude officer's opinion as to whether any other witness is telling the truth." During trial, the recording of Saavedra's interview with Delfin was played for the jury.[8]

After the recording finished, counsel approached the bench for a sidebar, at which time Saavedra's counsel said she failed to "review every single word of that transcript" because she "didn't realize [Delfin] goes on talking about how he doesn't believe my client and what he's saying." Saavedra's counsel reminded the court that it had granted the defense in limine motion to exclude police officers' opinions of credibility. The trial court responded that the in limine ruling related to testimony, and that "what happened in the tape and what happened in the interview is . . . a piece of evidence that you can definitely argue."

With respect to the emergency protective order, Saavedra's counsel expressed concern that Delfin was trying to bolster the victim's credibility by reading it to Saavedra on the recording. The trial court noted that it was a matter of policy and procedure that was followed in every domestic violence case and acknowledged that the "issue of the emergency protective order needs to be clarified. . . . These are procedures that are followed and they're required to follow them."

Following the conclusion of the sidebar, the prosecutor asked Delfin, "If somebody is accused of domestic violence, is it your . . . agency's policy that you arrest the person that is accused of being the perpetrator or the person that caused the injuries?" Delfin responded that once probable cause to arrest was established, rather than merely an accusation of domestic violence, it was department policy to arrest the suspect.

---

[8] The record shows the jurors were provided transcripts of the interview to review while the recording was played, but those transcripts were collected by the bailiff after the playback finished.

9

The trial court interjected at this point, explaining to the jury that probable cause to arrest involves a "lower standard of proof than proof beyond a reasonable doubt" and that a person who is arrested must still be proven guilty beyond a reasonable doubt.

The prosecutor continued her examination of Delfin, asking if it is "also part of your policies and procedures at your agency in a domestic violence case or allegation that you serve the perpetrator with an emergency protective order?" Delfin responded that, if such an order had been issued by a judge, police officers were required to serve it on the accused.

On cross-examination, Delfin confirmed that the policies and procedures he must follow in domestic violence cases are applied to everyone, and that he did not make up and apply a "new policy" to Saavedra.

### 2. *Ineffective assistance of counsel*

The appellant has the burden of proving inadequacy of trial counsel. (*People v. Pope* (1979) 23 Cal.3d 412, 425.) He must establish that no reasonably competent attorney would have done what defense counsel did *and* that he was prejudiced by defense counsel's conduct, i.e., that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. (*People v. Lucas* (1995) 12 Cal.4th 415, 436.) The record must affirmatively show defense counsel "failed to research the law or investigate the facts in the manner of a diligent and conscientious advocate." (*People v. Pope*, *supra*, at p. 425.) To justify relief on appeal, defendant must show that defense counsel's actions could not be explained on the basis of any knowledgeable choice of tactics. (*Id*. at p. 426, fn. 16.)

However, "a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of

10

sufficient prejudice, which we expect will often be so, that course should be followed." (*Strickland v. Washington* (1984) 466 U.S. 668, 697.)

We agree with Saavedra that his counsel was ineffective for failing to carefully review the transcript of his interview with Delfin and thus not trying to redact out Delfin's expressions of disbelief. Defense counsel has a duty to review material that will be used by the prosecution. (*Rompilla v. Beard* (2005) 545 U.S. 374, 383-390.) Further, defense counsel must object to inadmissible and prejudicial evidence. (*In re Jones* (1996) 13 Cal.4th 552, 573-578; *In re Wilson* (1992) 3 Cal.4th 945, 955-956.) Saavedra's counsel failure to object was not in any way a tactical decision. Rather, it stemmed from counsel's failure to closely read the transcript of the recorded interview prior to it being played for the jury. Her conduct in this regard was below what is expected of a reasonably competent attorney.

Despite this, we conclude it is not reasonably probable that Saavedra would have obtained a more favorable result had his counsel objected and ensured that the jury heard a redacted version of the interview with the portions in which Delfin expressed his disbelief in Saavedra's account, as well as the references to the emergency protective order, excised. Even under those circumstances, the jury would have heard Saavedra's explanation of what happened, which utterly failed to account for the victim's injuries, injuries which were corroborated by the photographs of the victim shown to the jury. The jury would have heard Saavedra tell Delfin at first that he and the victim were "just friends," that they were not having sex, but then admitting they had sex the first night they met, then saying they had sex three times in the three months they were together. The jury would still have heard Saavedra say that the victim lost control of her bladder during that argument, not because he was hurting her physically or that she was frightened he would, but because she was terrified he would leave her and tell police she was dealing drugs.

11

In addition, the jury also had Brewer's and Fernandez's testimony to consider. Brewer said he saw Saavedra holding the victim's arm when he arrived, that Saavedra was angry and he had to physically escort Saavedra out of the victim's home. Brewer testified Saavedra threatened to kill the victim, and was upset and crying on her porch. All of this was directly contrary to Saavedra's account that *he* was the one who wanted to leave the victim and he only touched her in order to calm her down.

Fernandez testified that Saavedra became angry with her as they drove to a restaurant and threw a glove in her face. When asked if Saavedra had actually slapped her, she did not deny he did, but said she did not remember. The jury also heard Fernandez deny calling the police about this incident, instead saying that someone at the restaurant must have done so, which would certainly have raised questions in the jurors' minds, such as why would anyone at the restaurant have called the police based on something that occurred *before* Fernandez and Saavedra arrived?

Furthermore, none of Delfin's expressions of disbelief during the interview were mentioned in the prosecutor's arguments to the jury. The transcript of the interview was not admitted into evidence, nor did the jury ask to hear the recording again during deliberations. Saavedra was convicted on count 2 and that conviction was supported by the victim's testimony and the photographs taken of her injuries that day. Those photos also tended to corroborate the victim's testimony about the time that Saavedra assaulted her in late January as charged in count 3, though on that count the jury only found him guilty of simple assault. The jury could not reach a verdict on count 1, but that incident took place over a month prior to the victim reporting Saavedra to the police. There were no contemporaneous photos showing any injury she might have suffered at that time. Based on the evidence the jury would have heard and viewed even if counsel had been effective, it is not reasonably probable that Saavedra would have obtained a more favorable result.

12

B.     *The trial court did not punish Saavedra for going to trial*

Saavedra next argues the trial court unconstitutionally imposed a harsher sentence to punish him for rejecting the court's pretrial offer and exercising his right to a jury trial. We disagree.

1.     *Relevant facts*

During jury selection, there was a discussion about a possible plea bargain.

The court offered to reduce one of the two felony counts to a misdemeanor and sentence Saavedra to three years formal probation with domestic violence terms and 180 days in jail. Based on his criminal history, the trial court said it did not consider this "a no jail case" even if a jury convicted Saavedra of lesser charges.

The court continued, "If Mr. Saavedra is convicted of a felony I am not foreclosing the possibility of a State Prison commitment based on a felony conviction, a violation of probation at the time of the domestic violence aspects of this case. The determination of whether a prison sentence is imposed or not as opposed to probation is only made by a preponderance of the evidence, more likely than not after consideration of several factors and a probation report. But, you know, I want to make it clear, Mr. Saavedra, that if you are convicted it's not a situation where I entertain usually people coming back and saying, Judge, I want the same thing that you indicated before. Part of the consideration of my indicated sentence is an early admission of responsibility and so forth." Defense counsel subsequently commented, "I do hope the Court isn't stating that if my client does continue to exercise his right to a jury trial that the Court would punish him for that." The court replied, "No, not at all. That's not the fact at all. [¶] . . . A person is not punished for going to trial. However, the Court after trial can consider all of the factors and everything it hears in formulating what its decision is. I don't want anybody ever to have a false sense of things. I mean, I do—I am a judge who takes into consideration a person's prior record. I do believe that people change, but that is something that you have to be aware of."

13

Following Saavedra's conviction, the trial court did not remand him into custody, but cautioned him that "[e]verything is on the table" before referring him to the probation department. In the probation report, the probation officer recommended Saavedra be placed on probation with 365 days in county jail. Before imposing sentence, the court commented, "I am not and cannot and must not punish you for having gone to trial. However, as counsel are aware, during the trial legitimate facts may come to the Court's attention, either through personal observation of the judge during trial or through the presentence report, to impose a sentence in excess of what was discussed."

After hearing from the prosecutor and defense counsel, the court explained the basis for its sentence as follows: "You would wrestle with the victim's 10-year-old son but were overly rough with him, who would end up crying, similar to your 2007 event.[9] . . . [¶] . . . [¶] Your transcript of your interview with Officer Delfin bordered on the ridiculous. Mr. Brewer, . . . who you said, blank [*sic*] you, I'll kill her and I'll kill you. I love her. I want to be here with you. You were crying. You came back with an airsoft pistol in your backpack. . . . [¶] . . . There were a lot of factors that would deny probation in this case to you, but to your credit I told you you would not be punished for going to trial and you are not being. . . . [¶] . . . [¶] Nonetheless, you have two prior felony convictions now for assault within the last seven years. . . . [¶] . . . [¶] So in this case the defendant has been convicted as to Count 2. The Court would impose a middle term of three years . . . but suspend execution of that. The middle term is selected because even though he has an aggravated record in terms of this conduct, it is mitigated by the fact that he is seeking treatment and seems to now be aware that there's a

---

[9] According to the probation report, Saavedra was "involved in a verbal argument with the son of his girlfriend" in 2007. He was "upset over a drawing of him the victim had drawn[, and] asked the victim, 'how would you like it if I shot you in the face with a 22?' " Saavedra then retrieved a loaded, semiautomatic handgun from his girlfriend's bedroom, put it in his waistband, and "continued to threaten to shoot the victim."

problem. . . . [¶] . . . [¶] So execution of sentence is suspended.  Defendant will be placed on five years formal probation under these terms. . . .  Serve 360 days in County Jail as follows; 180 days jail on Count 2, 180 days jail on Count 3. . . .  The defendant has twelve days total credit."

A defendant may not be penalized for exercising his or her jury trial right, which is a violation of Fourteenth Amendment due process rights.  (*In re Lewallen* (1979) 23 Cal.3d 274, 278 (*Lewallen*); *People v. Collins* (2001) 26 Cal.4th 297, 306-307.)  " '[A] court may not offer any inducement in return for a plea of guilty or nolo contendere.  It may not treat a defendant more leniently because he foregoes his right to trial or more harshly because he exercises that right.' " (*People v. Clancey* (2013) 56 Cal.4th 562, 575, quoting *People v. Superior Court* (*Felmann*) (1976) 59 Cal.App.3d 270, 276.)

Although a court may not impose a harsher sentence on a defendant as punishment for exercising his or her jury trial right, "[t]here must be some showing, properly before the appellate court, that the higher sentence was imposed as punishment for exercise of the right." (*People v. Angus* (1980) 114 Cal.App.3d 973, 989-990.)  In *Lewallen*, *supra*, 23 Cal.3d 274, the defendant refused to accept a negotiated sentence.  Following a jury trial, at sentencing, the defense attorney requested informal rather than formal probation. (*Id*. at p. 276.)  The trial court responded:  " 'I think I want to emphasize there's no reason in having the District Attorney attempt to negotiate matters if after the defendant refuses a negotiation he gets the same sentence as if he had accepted the negotiation.  It is just a waste of everybody's time, and what's he got to lose.  And as far as I'm concerned, if a defendant wants a jury trial and he's convicted, he's not going to be penalized with that, but on the other hand he's not going to have the consideration he would have had if there was a plea.' " (*Id*. at p. 277.)  The Supreme Court remanded the matter for resentencing, finding that the defendant had shown "that the trial court's exercise of its sentencing function was improperly influenced by his refusal of the proffered plea bargain and insistence on his right to trial." (*Ibid*.)

15

*Lewallen* emphasized "that a trial court's discretion in imposing sentence is in no way limited by the terms of any negotiated pleas or sentences offered the defendant by the prosecution. The imposition of sentence within the legislatively prescribed limits is exclusively a judicial function." (*Lewallen*, *supra*, 23 Cal.3d at p. 281.) "Legitimate facts may come to the court's attention either through the personal observations of the judge during trial [citation], or through the presentence report by the probation department, to induce the court to impose a sentence in excess of any recommended by the prosecution." (*Ibid*.) "The mere fact . . . that following trial defendant received a more severe sentence than he was offered during plea negotiations does not in itself support the inference that he was penalized for exercising his constitutional rights." (*People v. Szeto* (1981) 29 Cal.3d 20, 35.)

In this case, there is no indication in the record that the trial court sought to punish Saavedra for asserting his right to a jury trial. The court stated several times that it was not imposing a greater punishment because Saavedra exercised his right to have a jury trial. The court essentially followed the probation officer's recommendation by suspending a three-year prison sentence and granting probation subject to the condition of serving 360 days in county jail. The court had seen and heard the evidence at trial and, thereby, had a more complete understanding of Saavedra's crimes than it did before trial. The trial court was able to observe the witnesses as they testified and learned more about the circumstances of Saavedra's offenses. Although both the victim and Delfin testified at the preliminary examination, their testimony in that proceeding was more abbreviated. Neither Brewer nor Fernandez testified at the preliminary examination so their testimony provided new evidence for the trial court to consider when formulating a sentence. The trial court also learned that Saavedra had violated the terms of a prior emergency protective order, even though that evidence was not presented to the jury.

Since the record supports the conclusion the court based its sentencing decision on the new information revealed at trial and in the probation report, we find no evidence that the court was punishing Saavedra for going to trial.

C.     *The trial court erred in awarding credits*

A trial court is required to calculate presentence custody and conduct credits. (§ 2900.5, subd. (d); *People v. Velazquez* (2011) 201 Cal.App.4th 219, 233.) Section 2900.5 provides in pertinent part as follows:  "(a) In all felony and misdemeanor convictions, . . . all days of custody of the defendant, *including days . . . credited to the period of confinement pursuant to Section 4019*, . . . shall be credited upon his or her term of imprisonment . . . . [¶] . . . [¶] (d) It is the duty of the court imposing the sentence to determine the date or dates of any admission to, and release from, custody prior to sentencing and the total number of days to be credited pursuant to this section.  The total number of days to be credited shall be contained in the abstract of judgment provided for in Section 1213."  (Italics added.)

In this case, although the trial court awarded Saavedra 12 days, a number it apparently derived from the probation report, there is nothing in the record which discloses how many days Saavedra spent in custody.  Was it six days, in which case he was awarded six days of custody credits, plus six days of section 4019 conduct credits?  Or was it 12 days, in which case he was only awarded credits for the actual time spent in custody and is therefore entitled to an additional 12 days of credit pursuant to section 4019?  We do not know, because the probation report does not provide that information, nor was it discussed by anyone at sentencing.  In the absence of any information by which this court could determine the appropriate amount of credits to award Saavedra, we have no choice but to reverse the judgment and remand the matter for resentencing so that those calculations can be made below.

**III. DISPOSITION**

The judgment is reversed.  The matter is remanded to the trial court for resentencing solely on the amount of presentence credits earned by defendant.

_____

Premo, J.

WE CONCUR:

_____

Rushing, P.J.

_____

Elia, J.