Filed 6/22/23  In re A.R. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.J.,<br><br>        Defendant and Appellant. | A164685<br><br>(Alameda County Super. Ct. No. JD-028398-02)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

**THE COURT**:

On our own motion, it is ordered that the opinion filed herein on June 6, 2023, be modified as follows:

1. On page 7, the first sentence of the first full paragraph is replaced with the following sentence:

1

In her initial opening brief on appeal, A.R. did not assert her trial counsel was ineffective by failing to object and by making certain concessions.

2. On page 10, footnote 5, the following paragraph is added at the end of the footnote:

In her petition for rehearing, A.R. asserts "this case [is] analogous to *B.D.,* [in which the court concluded the minor's] due process rights were violated by the trial court's unfair limitations on trial counsel . . . ." (Pet. 7) To the contrary, the *B.D.* court concluded the Bureau violated the minor's due process rights to a fair hearing by failing to include numerous egregious facts in the section 366.26 report, including that one of the foster/prospective adoptive parents had spent seven years in prison for a home invasion burglary, had his parental rights terminated as to three sons, those now-adult sons were both victims and perpetrators of sexual abuse against children, at least one of those sons lived with the foster parents and the minor, and the foster parent allowed his adult nephew to share a bedroom with the minor. (*In re B.D.* (2019) 35 Cal.App.5th 803, 811, 824.) There were no such omissions in the Agency's report.

There is no change in the appellate judgment.
The petition for rehearing is denied.

Date:_____                    _____A.P.J.

2

Filed 6/6/23  In re A.R. CA1/1 (unmodified opinion)
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | |
| ALAMEDA COUNTY SOCIAL SERVICES AGENCY,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>M.J.,<br><br>      Defendant and Appellant. | A164685<br><br>(Alameda County Super. Ct. No. JD-028398-02) |

The minor child, A.R., appeals from the order terminating parental rights under Welfare and Institutions Code section 366.26.[1]  She maintains the Alameda County Social Services Agency (Agency) conducted an inadequate adoption assessment report, denying her due process and resulting in a finding of adoptability that is unsupported by substantial evidence.  She makes this argument in the context of an ineffective assistance of counsel (IAC) argument, as A.R.'s attorney in the juvenile court made no objection to the report and, in fact, conceded minor is adoptable.  On appeal,

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

1

A.R. has not demonstrated her trial counsel was ineffective in making that concession.

A.R. also asserts the Agency failed to comply with its duty of initial inquiry under ICWA once her biological father was identified. We conclude A.R. is correct on this point and remand the matter to the juvenile court with directions that the court and the Agency comply with the inquiry (and if appropriate) notice provisions of ICWA and related California law.[2]

**BACKGROUND**

There have been numerous appeals and petitions in this dependency proceeding, which commenced in 2017 when A.R. was less than a year old. Because the parties are familiar with the facts and procedural history, we set forth an abbreviated version of the background of the case as stated in a prior opinion of the Supreme Court.

"[Mother] gave birth to A.R. in 2016. At the time, [Mother] herself was still a minor. Less than a year later, the . . . Agency . . . filed a petition under . . . section 300 to have A.R. declared a dependent of the court. The operative petition alleged that [Mother] had mental health concerns, such as depression, that impeded her ability to care for her child. The juvenile court sustained the petition. Although the court attempted to place A.R. with [Mother], [Mother] later raised concerns about her ability to care for A.R. while she finished high school. The court ordered A.R. placed in a foster home while [Mother] participated in family reunification services. [¶] Several

---

[2] A.R.'s biological father, M.J., also appealed from the order terminating his parental rights, as well as from an order denying a section 388 petition asking that he be elevated to presumed father status and for visitation. After the cases were consolidated, M.J. sought dismissal of his appeals, and we did so on February 15, 2023. Mother has not appealed from the termination of her parental rights.

2

months later, the court entered an order terminating reunification services." (*In re A.R.* (2021) 11 Cal.5th 234, 243–244.)

"At the [section 366.26] hearing, the court . . . turned to the question of whether to permanently sever [Mother's] parental rights. [Mother's] attorney urged the court instead to apply the beneficial parental relationship exception to the termination of parental rights. ( § 366.26, subd. (c)(1)(B)(i).) The court rejected that argument and entered an order terminating [Mother's] parental rights" in June 2019. (*In re A.R.*, *supra*, 11 Cal.5th at p. 244.)

We dismissed Mother's appeal from the order terminating her parental rights as untimely. The Supreme Court granted review, and reversed and remanded the case, concluding when parents' "court-appointed attorneys have failed to timely file a notice of appeal of an order terminating parental rights, parents whose rights have been terminated may seek relief based on the denial of the statutory right to the assistance of competent counsel." (*In re A.R.*, *supra*, 11 Cal.5th at p. 257.)

On remand, we addressed the appeal on the merits, considering whether the trial court erred in concluding the beneficial relationship exception to terminating parental rights applied. We concluded " 'the juvenile court did not have the benefit of the guidance provided in [*In re*] *Caden C.* [(2021) 11 Cal.5th 614,]' and as a consequence considered improper factors in determining whether the parental benefit exception applied." (*In re A.R.* (Aug. 20, 2021, No. A158143) [nonpub. opn.].) We therefore remanded the matter to the juvenile court to conduct a new section 366.26 hearing in conformance with the principles articulated in *Caden C.* . . . and taking into consideration the family's current circumstances. . . ." (*In re A.R.*, *supra*, A158143.)

3

A few days after that opinion was filed, alleged father M.J. came forward, and DNA test results later showed a 99.99 percent probability he is A.R.'s biological father.[3]  He filed a section 388 petition seeking elevation to presumed father status and visitation with A.R., which the juvenile court denied.  M.J. told a social worker he had no "Native American Ancestry in his family of which he is aware."

The Agency filed a section 366.26 report in January 2022 again recommending termination of parental rights and adoption.  The report also stated that in January 2020, Mother gave birth to A.R.'s half-brother, who "remains in the mother's care."  A.R. had been placed "out of home" with her initial foster mother, P.T., since February 2018.  In August 2019, the current foster mother, Z.T., "joined the foster family and moved in," and the foster mothers married.  P.T. and Z.T. were designated as prospective adoptive parents in November 2019.

In December 2021, about a month before the second section 366.26 hearing, A.R.'s foster parents separated after P.T. was "briefly arrested" for allegedly striking Z.T. in the face.  Z.T. obtained a restraining order, separated from P.T., and plans to divorce.  An "[e]mergency [r]esponse [u]nit" investigation was closed as "unfounded."

Z.T. "remains committed to adopting [A.R.], and [A.R.] continues to state that she wants to remain there and has no worries about it, although she misses the former caregiver. . . ."  Z.T. has three biological sons and has adopted before, has been employed as a social worker for a foster family agency, and has no criminal record or protective services history.  A.R. told the social worker "she feels safe with her caregiver and wants to stay there."

---

[3]  Mother had identified another man, C.G., as the father, but had given A.R. the surname of the man she was dating when she was pregnant.

At the time of the report, A.R. was five years old and in kindergarten. She was generally in good physical health. She had been diagnosed with eczema, for which she was treated with hydrocortisone cream, and sleep difficulties, for which she was taking Clonidine. She also had been prescribed eyeglasses for astigmatism.

A.R. also had been diagnosed with autism spectrum disorder and had been receiving intensive therapy for up to 30 hours a week from the Center for Autism Related Disorders (CARD) program. Her autism symptoms— aggression, repetitive behaviors, and minimal cooperative play—"are apparent at home and day care, and at the CARD program." However, at school she "doesn't exhibit these symptoms as much" and providers and caregivers attribute her improvement to the "intensive therapy" she has received from the CARD program. The program goals for A.R. were "reduction in negative behaviors including aggression, screaming and Pica symptoms, and an increase in positive skills such as communication, social skills, following directions, and engagement."

A.R. "previously had met qualifications for Global Developmental Delay diagnosis in October of 2018 and was supported by an IEP [(Individual Education Plan)] and attended a special education classroom for one academic year." At her last IEP meeting in March 2021, it was determined that she "no longer met qualifications." Her kindergarten teacher reported A.R. "is a 'self-starter, smart, social, makes eye contact, does well with schoolwork, is on task, and usually does well with transitions.'" She "knows her colors, knows the alphabet, and can count and write her name."

The report described A.R. as a "busy, curious[,] and sometimes shy young girl who loves to draw colorful pictures. . . . She is better at engaging with people she knows than with unfamiliar people. For example, with her

5

foster family, school classmates, and peers at daycare, she is able to make eye contact, have a conversation, and engage in play. She can still be upset by a child she does not know asking her to play in a playground. She still has triggers which can send her spiraling into a tantrum at a moment's notice; however, she is usually able to be consoled by her caregivers or providers. . . . She can still be impulsive and can be aggressive with peers without warning, but this doesn't occur often."

At the hearing, a social worker testified she had included information about the incident between the caregivers in the Agency report because it was "a change in the child's circumstances." It did "not impact [A.R.'s] adoptability," and she was "still adoptable."

Following the hearing, the juvenile court found A.R. was not an Indian child, and no further notice was required under ICWA. The court also found there was no "substantial beneficial relationship" with Mother and that A.R. was adoptable, observing "she has some health issues . . . [b]ut there is nothing in the record that shows a child who has Autism, and this child in particular, is not adoptable." The court terminated the parental rights of both mother and biological father M.J.

**DISCUSSION**

*The Adoptability Finding*

A.R. maintains the Agency's "Adoption Assessment Report" submitted for the section 366.26 hearing was inadequate, and consequently, no substantial evidence supported the juvenile court's finding of adoptability.

As we observed at the outset, A.R.'s trial counsel did not object to the adequacy of the assessment. Indeed, she affirmatively stated at the hearing she was "not disputing that [A.R.] is adoptable." She further urged that if the

6

court terminated parental rights, it "grant the status of p[ro]spective adoptive parent to [Z.T.]."

In her opening brief on appeal, A.R. did not address the consequences of her trial court's failure to object and concessions. She later filed a supplemental brief, in which she concedes "[a]t no stage did trial counsel expressly object to the substance of the Agency's section 366.26 report nor did she expressly object to the trial court's finding that A.R. was adoptable." She asserts that, to the extent her trial counsel did not preserve the issue of the asserted inadequacy of the Agency's section 366.26 and resulting lack of evidence to support the finding of adoptability, her counsel was ineffective.

"In general, the proper way to raise a claim of ineffective assistance of counsel is by writ of habeas corpus, not appeal. [Citations.] However, an ineffective assistance claim may be reviewed on direct appeal where 'there simply could be no satisfactory explanation' for trial counsel's action or inaction.' (*People v. Pope* [(1979) 23 Cal.3d 412,] 426[4].)" (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98, fn. 1 (*Dennis H.*).)

"To establish ineffective assistance of counsel in dependency proceedings, a [litigant] 'must demonstrate both that: (1) his [or her] appointed counsel failed to act in a manner expected of reasonably competent attorneys acting as diligent advocates; and that (2) this failure made a determinative difference in the outcome, rendering the proceedings fundamentally unfair in that it is reasonably probable that but for such failure, a determination more favorable for [the minor's] interests would have resulted.' [ Citations]. In short, appellant has the burden of proving both that his [or her] attorney's representation was deficient and that this

---

⁴ Overruled on other grounds as stated in *People v. Delgado* (2017) 2 Cal.5th 554, 559.

7

deficiency resulted in prejudice." (*Dennis H.*, *supra*, 88 Cal.App.4th at p. 98, capitalization omitted.)

In this case, A.R.'s juvenile court counsel did not simply fail to object—she expressly conceded that A.R. was adoptable. A.R. has not demonstrated this was *not* the action of a "reasonably competent [counsel] acting as [a] diligent advocate[]," nor has she shown there " 'simply could be no satisfactory explanation' for trial counsel's action or inaction.' " (*Dennis H.*, *supra*, 88 Cal.App.4th at p. 98 & fn. 1.) The readily apparent "satisfactory explanation" for the concession is that A.R. was, indeed, adoptable.

The adoptability issue at a section 366.26 hearing focuses on the dependent child, e.g., whether his or her age, physical condition, and emotional state make it difficult to find a person willing to adopt. (*In re Sarah M.* (1994) 22 Cal.App.4th 1642, 1649 (*Sarah M.*).) "[I]t is not necessary that the child already be in a potential adoptive home or that there be a proposed adoptive parent 'waiting in the wings.' ([*In re*] *Jennilee T.* [(1992)] 3 Cal.App.4th [212,] 223, fn. 11. . . .)" (*Ibid.*) But, the existence of a prospective adoptive parent, who has expressed interest in adopting a dependent child, constitutes evidence that the child's age, physical condition, mental state, and other relevant factors are not likely to dissuade individuals from adopting the child. In other words, a prospective adoptive parent's willingness to adopt generally indicates the child is likely to be adopted within a reasonable time either by the prospective adoptive parent or by some other family. (*Id.* at pp. 1649–1650.)

"[I]n some cases a minor who ordinarily might be considered unadoptable due to age, poor physical health, physical disability, or emotional instability is nonetheless likely to be adopted because a prospective adoptive family has been identified as willing to adopt the child. Where the

social worker opines that the minor is likely to be adopted based *solely* on the existence of a prospective adoptive parent who is willing to adopt the minor, an inquiry may be made into whether there is any legal impediment to adoption by that parent. . . .  In such cases, the existence of one of these legal impediments to adoption is relevant because the legal impediment would preclude the very basis upon which the social worker formed the opinion that the minor is likely to be adopted." (*Sarah M., supra,* 22 Cal.App.4th at pp. 1650–1651, italics added.)  But where, as here, "the social worker's opinion that [the minor is] likely to be adopted was not based solely on the foster mother's desire to adopt," but on a collection of factors, no inquiry need be made into whether there is any legal impediment to adoption by that parent. (*Id.* at p. 1651.)

" 'General suitability to adopt is a subjective matter which does not constitute a legal impediment to adoption.  If inquiry into the suitability of prospective adoptive parents were permitted in section 366.26 hearings, we envision that many hearings would degenerate into subjective attacks on all prospective adoptive families in efforts to avoid termination of parental rights.  Such a result is not envisioned by the statutory scheme.' " (*Sarah M., supra,* 22 Cal.App.4th at p. 1650.)

In any event, the evidence before the court overwhelmingly showed A.R. was adoptable, demonstrating both a "satisfactory explanation" for, and a lack of prejudice from, trial counsel's concession.  A.R. was a generally healthy child who was doing well in school, doing well socially, and doing well in her foster home.  Although she had been diagnosed with autism spectrum disorder, she was doing well academically, had made significant progress due, in part, to intensive therapy, and was no longer eligible for an IEP.  As to factors specific to A.R., the report indicated she was in generally good

health, but had been diagnosed with developmental delays and was on the autism spectrum. Her teacher reported she was " 'a self-starter, smart, social, makes eye contact, does well with schoolwork, is on task, and usually does well with transitions.' " There was no evidence that A.R.'s other behaviors, such as "not respond[ing] when talked to" by unfamiliar people or "respond[ing] with her head turned away or get[ting] angry that the person is talking to her" make her unadoptable. Foster parent Z.T., already designated as the prospective adoptive parent, remained committed to adopting A.R. even though she and her wife had separated.[5] A.R. stated she felt safe there and wanted to stay with Z.T. The Agency's conclusion A.R. was adoptable

---

[5] A.R. also claims the assessment of Z.T. as a prospective adoptive parent was inadequate because "[t]he Agency seemingly ignored the impact of the December 6, 2021, incident on the question of adoptability." Although that incident was not relevant to A.R.'s adoptability, the Agency specifically addressed it, and indicated Z.T. "remains committed to adopting [A.R.]," and A.R. told the child welfare worker she "feels safe with her caregiver and wants to stay there." In short, the incident had no effect on the factors specific to A.R. that made her adoptable.

A.R. further asserts the juvenile court erred in sustaining the Agency's relevancy objections to her questions about P.T. and Z.T., thereby preventing her counsel from "examin[ing] the Agency's witnesses to test the sufficiency of the Agency's claim that A.R. was adoptable" and violating her due process rights. As the court observed "the issue before the Court at a .26 is is the child adoptable, not who is going to adopt the child, not who is going to make a promise of visitation about the child." (See *Sarah M.*, *supra*, 22 Cal.App.4th at pp. 1650–1651.) Moreover, the trial court is "vested with wide discretion in determining the relevance of evidence," but "has no discretion to admit irrelevant evidence." (*People v. Babbitt* (1988) 45 Cal.3d 660, 681.) A.R has not shown any abuse of discretion in the trial court's evidentiary rulings, let alone error of constitutional magnitude. (See *Maricela C. v. Superior Court* (1998) 66 Cal.App.4th 1138, 1147 ["The due process right to present evidence is limited to relevant evidence of significant probative value to the issue before the court."].)

10

was not based solely on Z.T.'s desire to adopt A.R., but on A.R.'s own qualities and characteristics.

In sum, A.R. has failed to show there could be no reasonable explanation for her trial counsel's actions or to demonstrate prejudice based on the claimed ineffectiveness of counsel.

## ICWA Inquiry

There is no dispute the Agency did not contact any extended family members on M.J.'s (the biological father) side of the family; in fact, there is no evidence the Agency or court even had M.J. fill out an ICWA-020 form regarding Indian ancestry. The Agency maintains, however, that its duty was extinguished when M.J. reported no known Indian heritage and identified no family member who would have more information. " 'Following changes to the federal regulations concerning ICWA compliance, California made conforming amendments to its statutory scheme regarding ICWA, effective in 2019. [Citation.] In *D.S.,* the court explained that the resulting clarification of law, found in part in section 224.2, "creates three distinct duties regarding ICWA in dependency proceedings. First, from the [Department]'s initial contact with a minor and his family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a 'reason to believe' the child is an Indian child, then the [Department] 'shall make further inquiry regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable.' (*Id.*, subd. (e). . . .) Third, if that further inquiry results in a reason to know the child is an Indian child, then the formal notice requirements of section 224.3 apply. [Citations.]" [Citation.]' " (*In re H.V.* (2022) 75 Cal.App.5th 433, 437, italics omitted (*H.V.*).)

11

" 'At the first step, "[s]ection 224.2, subdivision (b) specifies that once a child is placed into the temporary custody of a county welfare department, such as the [Agency], the duty to inquire 'includes, but is not limited to, asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child.' " ' " (*H.V., supra,* 75 Cal.App.5th at p. 437.*)*

The Agency concedes recent cases have concluded a child welfare agency has a "duty to investigate a child's possible Indian ancestry where a parent denies such ancestry." In *In re A.C.* (2022) 75 Cal.App.5th 1009, the mother of A.C. completed an ICWA form by checking a box indicating none of seven listed factors regarding Indian ancestry applied. (*Id.* at p. 1013.) Father's form also stated, " 'Note: This form is not intended to constitute a complete inquiry into Indian heritage. Further inquiry may be required by the Indian Child Welfare Act.' " (*Ibid.*) The court concluded the agency in that case "failed to comply with its 'obligation to make a meaningful effort to . . . interview extended family members to obtain whatever information they may have as to the child's possible Indian status.' " (*Id.* at p.1015.)

In *In re Antonio R.* (2022) 76 Cal.App.5th 421 (*Antonio R.*), the father's whereabouts were unknown, and mother checked the box on a parental notification of Indian status form stating she had " 'no Indian ancestry as far as I know.' " (*Id.* at p. 427.) At the detention hearing, the court asked the paternal grandmother whether father had "any Indian ancestry 'that [she is] aware of' " and she responded " 'No.' " (*Ibid.*) About two months later, the Department reported that "the paternal great-grandmother denied having Indian ancestry on her side of the family," and Mother indicated "to her knowledge Father had no Indian ancestry." (*Ibid.*) Father first appeared at

the jurisdictional hearing about two months later and denied having Indian ancestry. (*Ibid.*) Four months later, at the disposition hearing, the maternal grandmother, maternal aunts, and a maternal uncle were present in the courtroom, but no one asked whether the minor may have Indian ancestry. (*Id.* at p. 428.) At the selection and implementation hearing, the maternal grandmother was questioned under oath, but was not asked whether the minor may have Indian ancestry. (*Ibid.*) The court terminated mother's and father's parental rights. (*Ibid.*)

On appeal, the court concluded the Department failed "to satisfy its initial duty of inquiry as to maternal extended family members, and the court[] fail[ed] to ensure that the Department met its duty." (*Antonio R.*, *supra*, 76 Cal.App.5th at p. 432.) "Thus, the record does not support the juvenile court's finding that ICWA does not apply." (*Ibid.*)

In this case, the only evidence of any ICWA inquiry by the Agency or court as to M.J. was that M.J. told a social worker he had no Native American ancestry "of which he was aware." There was no evidence in the record the Agency or the court had M.J. fill out the ICWA-020 form. Nor is there any evidence the Agency searched for or could not locate M.J.'s extended family members or made any attempts to question them about Indian ancestry. The Agency was aware of the whereabouts of some paternal relatives, given that M.J. stated in his declaration filed in support of his section 388 motion that he lived with A.R.'s paternal grandparents, and that A.R. had "a large paternal family." The record also shows that M.J.'s father (A.R.'s biological grandfather) appeared at a remote hearing on M.J.'s section 388 petition but was not asked about Indian ancestry. Indeed, he was denied a request to speak.

13

"[R]ecent appellate jurisprudence has adopted a continuum of tests for prejudice stemming from error in following California statutes implementing ICWA ranging from a per se rule that any error is always prejudicial, to a test advocated by the dissent finding no prejudice unless the appealing parent makes a proffer that interviewing extended family members would yield information about potential Indian ancestry." (*In re A.C., supra,* 75 Cal.App.5th at p. 1011.) "The rule at one end of this continuum is one that mandates reversal:  If the Department's initial inquiry is deficient, that defect necessarily infects the juvenile court's ICWA finding and reversal is automatic and required (the 'automatic reversal rule').  [Citations.]  Under this test, reversal is required no matter how 'slim' the odds are that further inquiry on remand might lead to a different ICWA finding by the juvenile court.  (*Antonio R.*, [,*supra*, 76 Cal.App.5th] at p. 435.)  The rule at the other end of the continuum is one that presumptively favors affirmance:  If the Department's initial inquiry is deficient, that defect will be treated as harmless unless the parent comes forward with a proffer on appeal as to why further inquiry would lead to a different ICWA finding (the 'presumptive affirmance rule').  (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1065, 1071. . . .)  [A] third rule lies in between: If the Department's initial inquiry is deficient, that defect is harmless unless 'the record indicates that there was readily obtainable information that was likely to bear meaningfully upon whether the child is an Indian child' and that 'the probability of obtaining meaningful information is reasonable' ('the readily obtainable information rule').  (*In re Benjamin M.* (2021) 70 Cal.App.5th 735, 744. . . .)" (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 777–778, rev. granted Sept. 21, 2022 (*Dezi C.*).)

*Dezi C.* introduced a fourth approach.  In *Dezi C.*, the appellate court held that ICWA inquiry error "is harmless unless the record contains

14

information suggesting a reason to believe that the child may be an 'Indian child' within the meaning of ICWA such that the absence of further inquiry was prejudicial to the juvenile court's ICWA finding." (*Dezi C., supra*, 79 Cal.App.5th at p. 779.) "For this purpose, the 'record' includes both the record of proceedings in the juvenile court and any proffer the appealing parent makes on appeal." (*Ibid*; *In re Ezequiel G.* (2022) 81 Cal.App.5th 984, 1014 (*Ezequiel G.*) [adopting *Dezi C.* approach].) Unsurprisingly, the parties disagree on which standard to adopt. A.R. contends the error is reversible per se, while the Agency, in turn, urges that of *Dezi C./Ezequiel G.*

In *Dezi C.*, the Agency made the following ICWA inquiry. "In December 2019, mother and father told a Department social worker that they had no American Indian heritage. The next day, mother and father filled out ICWA-020 forms, and checked the box indicating that they had no American Indian heritage 'as far as [they knew].' At the hearing on whether to initially detain the children, mother and father told the juvenile court that they had no American Indian heritage. [¶] While investigating the allegations in this case, the Department's social workers spoke to father's parents (the paternal grandparents), mother's parents (the maternal grandparents), father's siblings, mother's siblings, and one of father's cousins. The social workers did not ask any of these individuals whether mother, father, or the children had any American Indian heritage." (*Dezi C.*, *supra*, 79 Cal.App.5th at p. 776.) On appeal, the court observed it was "undisputed that the Department's initial inquiry was deficient," but found the error harmless under its newly formulated "reason to believe" standard. (*Id.* at p. 776, 779.)

Similarly, in *Ezequiel G.*, the Court of Appeal found any error harmless. Both parents "unequivocally denied Indian ancestry," parents were in "contact with their extended families, and thus the possibility that

15

they might unknowingly be members of a tribe appears trivially small," and mother had "not identified any evidence in the record that would support an inference that she or the children's fathers might unknowingly be members of an Indian tribe." (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1015.)

We need not choose between the competing standards, as the record in this case is not of the same caliber as the records in *Dezi C.* and *Ezequiel G.* Even applying the *Dezi C.* standard, there is "reason to believe" further inquiry might lead to a different result because the Agency's ICWA inquiry as to M.J. and his extended relatives was so deficient. Unlike in *Ezequiel G.*, the record does not show that M.J. unequivocally denied Indian ancestry. (*Ezequiel G.*, *supra*, 81 Cal.App.5th at p. 1015.) The only evidence about any inquiry of M.J. or his family is the social worker's statement in the Agency report that indicates M.J. told a social worker he had no "Native American Ancestry in his family *of which he is aware*." (Italics added.) Nor does the record show M.J. or his extended family members were asked any of the relevant questions, as set forth in the ICWA-020 form, about A.R.'s potential Indian status. The record does not reflect that the Agency or court had M.J. fill out an ICWA-020 form[6], and he was not questioned about possible Indian ancestry or status at the hearings at which he appeared. The ICWA-020

---

[6] "At the first appearance by a parent . . . and all other participants in any dependency case . . . and at each hearing that may culminate in an order for foster care placement, termination of parental rights, preadoptive placement or adoptive placement, as described in Welfare and Institutions Code section 224.1(d)(1) . . . the court must: [¶] (A) Ask each participant present whether the participant knows or has reason to know the child is an Indian child; [¶] (B) Instruct the parties to inform the court if they subsequently receive information that provides reason to know the child is an Indian child; and [¶] (C) Order the parent, Indian custodian, or guardian, if available, to complete *Parental Notification of Indian Status* (form ICWA-020)." (Cal. Rules of Court, rule 5.481(A)(2)(A)-(C).)

16

form sets out seven questions about the minor's possible Indian status, including whether "[o]ne or more of my parents, grandparents, or other lineal ancestors is or was a member of a federally recognized tribe," and whether the parent is a "resident of or . . . domiciled on a reservation, rancheria, Alaska Native village, or other tribal trust land." (ICWA-020 Parental Notification of Indian Status form, https://www.courts.ca.gov/documents/icwa020.pdf [as of June 6, 2023].) These questions are not answered in a general response that there is "no "Native American Ancestry in his family of which he is aware." The Agency likewise did not follow up on "readily obtainable information" by interviewing his family members, at least one of whom appeared at a hearing but was denied a request to speak. On balance, we conclude the Agency should have at least required M.J. to fill out the ICWA-020 form, and should have questioned father's relatives for whom it had or could readily obtain contact information, and that the failure to do so was prejudicial.

"[R]equiring an adequate initial inquiry be conducted and documented in the record should not translate into an exhaustive inquiry to ensure '[n]o stone is left unturned.' " (*In re K.H.* (2022) 84 Cal.App.5th 566, 603.) We conclude, however, it would not be unduly burdensome for the Agency to require M.J. to complete an ICWA-020 form, and conduct a minimum inquiry of father's extended family members who are readily identifiable and for whom it has contact information. (See *id.*, at p. 620 ["Agencies and lower courts are, by now, on very clear notice of the problems caused when little to no inquiry is made. While we are not persuaded that compliance with section 224.2 will prove onerous once agencies provide a record of their efforts for the juvenile court to review, we may not interpret the law to relieve either one of their burden of complying with the plain directives of the statute."].)

17

## DISPOSITION

The juvenile court's finding that ICWA does not apply is conditionally reversed, and the matter is remanded to the juvenile court with directions to order the Agency to comply with the inquiry and documentation set forth in section 224.2 and California Rules of Court, rule 5.481 as to the biological father's family.  If after determining an adequate inquiry has been made, the court finds ICWA applies, the court shall vacate its existing order and proceed in compliance with ICWA and related California law.  If the court finds, instead, that ICWA does not apply, its ICWA finding shall be immediately reinstated.  In all other respects, the court's order terminating parental rights is affirmed.

_____

Banke, J.


We concur:


_____

Margulies, Acting P.J.


_____

Bowen, J.*


**Judge of the Contra Costa County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.


A164685, In re AR

19